[Civ. No. 1040. Fourth Appellate District.—June 14, 1934.]

CHARLES A. SIECK, Respondent, v. OAKLEY J. HALL
et al., Appellants.

Ralph E. Jenney, Wright & McKee and C. M. Monroe for Appellants.

Sanders & Jacques for Respondent.

HAINES, J., *pro tem.*—This action was brought to recover compensation additional to his regular salary as a salesman of gasoline, oils and grease, claimed to be due to the plaintiff and respondent Charles A. Sieck from the defendants and appellants under two several arrangements made in the early months of 1928. Judgment was given in favor of plaintiff and respondent against all the defendants and appellants, but respondent now concedes that it cannot be supported by the evidence as against any of the defendants and appellants other than the Star & Crescent Oil Co., so that our discussion of the case need only go to the controversy between Sieck and that corporation.

During the years 1927 and 1928 appellant Star & Crescent Oil Co. was engaged in handling and selling at San Diego, California, the gasolines, oils and greases manufactured by the Associated Oil Company, and was allowed to retain as compensation for so doing certain "differentials", which, for the purposes of this decision, may be

taken to mean the difference between the prices at which the products were sold by appellant on the market and·the prices at which they were furnished by the Associated Oil Company to this appellant. The basis on which these differentials were fixed is not disclosed by the evidence but it does appear that the basis was more liberal during the first ten months of 1927 than it was in the last two months of that year or through any part of 1928. During all this time the appellant Oakley J. Hall, referred to in the record as "Capt. Hall", was president and manager of appellant Star & Crescent Oil Co., and at the end of 1927 and in the earlier part of 1928 it had five salesmen, that is one Miller, its sales manager, and his subordinates Hagan, Murray, Eckles, and plaintiff Sieck, engaged in selling the products referred to to the public. Each of the latter four salesmen had assigned to him a portion of the local territory in which Miller had general oversight of the sales. All five salesmen were paid regular monthly salaries, which included certain allowances for gas and oils consumed by them in covering the territory involved. Miller and Sieck had been so employed throughout 1927, Eckles from the first of March of that year, Hagan and Murray from some time in July and from some time in November of that year respectively, while during the first three months of 1927 another salesman named Clark had also been so employed. Besides these regular salesmen other employees were more or less engaged in making sales, that is, one Bruington and one Johnson made sales for marine purposes and one Captain Spielman was utilized as a salesman "chiefly for stove distillate", but also "drummed up some oil and gasoline business". One Collins, ·a truck driver, and certain other truck drivers, all working on regular salaries, made certain sales.

It is, in the original complaint filed by plaintiff and respondent, asserted that while "on or about January 20, 1928," respondent, "together with four other like sales representatives", thereby referring to Miller, Hagan, Murray and Eckles, were in the employ of defendants (appellants here) engaged in the sale of said products, "the said defendants . . . stated to plaintiff and the other said sales representatives that in order to induce plaintiff and the other said sales representatives to expend additional efforts in increasing the sales of the said oil products of the

said defendants during the ensuing year, that if the plaintiff and the other said sales representatives by their efforts should bring an increase in the gross amount of sales of the said oil products during the said year over the gross sales made in the preceding year of 1927, that the amount of increase in such gross sales over the preceding year would be divided into two portions, one of which was to be retained by the defendants, and the other portion was to be divided equally, share and share alike, among the plaintiff and the other said sales representatives, it being provided, however, that if any additional sales force were employed, that the salary of such additional sales force should be deducted from the amount of the gross sales before division was made.''

The further arrangement counted on by respondent is set out by allegations in his original complaint:

''That on or about April 1, 1928, one of the other said sales representatives quit his employment, to wit, Laurie Eckles, and that thereupon, the said defendants and their said agents called the plaintiff and the other three representatives together and stated that if they would divide among themselves the territory and duties of the said Eckles and carry on his work themselves, that the original agreement of January 20, 1928, would continue, and that the net salary of Eckles for the remainder of said year, to wit, nine months, would be held in a separate fund, to be divided in four equal parts among the plaintiff and the other three said sales representatives at the end of the year, irrespective of whether or not an increase in the gross sales was produced . . . ''

The complaint goes on to allege the occurrence of the conditions entitling the plaintiff to compensation additional to his salary under each of the two arrangements set up. The answer traverses the allegations of the complaint concerning each of the arrangements for additional compensation asserted, and, contrariwise, avers that ''all salary, wages, commission and compensation of every kind earned by the plaintiff . . . have been paid to him by defendant, Star & Crescent Oil Co.'' It is on these pleadings that the trial was had.

Before the trial respondent Sieck's deposition was taken, in course of which he claimed that at the meeting when the

bonus arrangement with the five salesmen was made, Capt. Hall, acting for the Star & Crescent Oil Co., had made and the salesmen had accepted a proposition described in the deposition as follows:

"That the gross income of 1927 was about $136,000.00; that any income over that—provided we increased the business and there was a larger income—would be divided,— half of it to be withheld by him, the other half to be equally divided among we five salesmen; provided that, if he had to hire any additional salesmen, that the sales expense would first be deducted from the total increase, then the division made. Also, that if any salesman of we five, were to resign before December 31st, he waived all claim to any bonus which might accrue."

Sieck was asked: "Do I understand you correctly, now, that he said the gross amount of business done in excess of the year previous would be divided in two, and half divided amongst the salesmen?" He answered: "As I outlined it there a moment ago. Yes." He was asked further: "Well, as I understand it, then, your bonus was to be figured on the sale price of these products without any reference to what the cost to the company might be?" His reply was "Correct."

Such an arrangement, of course, would be most unlikely, since, in promising the salesmen half of the gross increase in the return from sales to be made, the Star & Crescent Oil Co. would be promising to pay them not only half of any profits to be made by it on the additional products to be sold, but half also of the actual cost to it of such additional products to be resold by it.

At the opening of the trial itself respondent called Capt. Hall to the stand under section 2055 of the Code of Civil Procedure and elicited from him his account of the proposition made by him. The account which he gave seems to be correctly epitomized by counsel for appellants in their opening brief as follows:

"In substance the plan was that the sales cost, which included the salaries and automobile allowances of the salesmen, would be applied to the gross profits from the sale of products in 1927. The gross profits as explained by the witness, were exactly what that term implies, viz., the difference between the cost and selling price of the product.

The ratio between the sales cost and the gross profits would thus be obtained as a percentage. This percentage would be applied to the gross profits from the same business in 1928. If the per cent so obtained was more than the sales expense, then the difference would be divided amongst the salesmen as a bonus.''

This, according to him, was the proposition accepted by the salesmen. The next witness called was the plaintiff Sieck, who, in the light of Capt. Hall's testimony, apparently appreciated that the account of the arrangement given in his complaint and in his deposition was inaccurate. But it is sufficiently evident from his testimony that he was, by this time, in some doubt or confusion about what the arrangement really was. When he undertook to state it on the stand his version of it was as follows:

''Mr. Hall made us this proposition; the cost factors of 1927 would obtain for 1928—he was trying to make this simple when he explained it to us—we had five salesmen in 1928, said Hall, and as a basis of payment for salaries— Q. You mean 1928 or 1927? A. 1927—that you —1927. Q. Repeat that again for the record. A. In 1927 as a basis for the salary factor, we will consider that we had five salesmen at an average salary per salesman— he dealt with a figure that ran something like $12,000— I am giving you as near as I can recall it, his conversation. And there would be taken as an example, he said, and he went over certain methods of calculation, nothing definite, but he said, 'Here is a figure of $136,000.' That was our gross or gross profit—I am not exactly certain of that term —that we will use as a basis to work on.'' ''Q. For what year? A. 1928. Now— Q. Just a moment now. You mean used as a basis of pay in 1928? A. For giving us a bonus based on the factors of 1927. Q. Well, is that $136,000 the gross profits mentioned to you as the basis for 1927? A. That is for 1927—yes. Remember he is the boss making us the proposition—we did not make him any. Q. Go ahead then. A. That that figure, using it as a basis, that any increase showing over that gross would be divided at the end of the year, one-half to be held by him, and the other half to be divided equally among we five salesmen, after first deducting any increases that may have been

occasioned in the sales department by employment of additional salesmen. That was agreed to.''

In cross-examining Sieck, appellants' counsel attempted repeatedly to learn whether it was his understanding that the bonus to be paid at the end of 1928 was to be reckoned on the increase in that year of gross sales or of gross profits over those for 1927, but could get little more from him than the assertion that Hall and his auditor, Rodel, had given the salesmen this 1927 figure of $136,000 (apparently later corrected to $136,702) and that they learned from Rodel that the corresponding figure for 1928 was $157,000 and that the figure of $136,000 was to play some part in the computation of the bonus. Asked what he understood the $136,000 to be, he said at one point in his cross-examination: ''I presume you would call it condensed gross income—a working factor.'' Referring to the corresponding 1928 figure he said: ''I had only their admission that there was a $20,000.00 increase.'' At one point he testified as follows: ''Q. Well now, is that factor of $136,000.00 that was given you—was that given you as gross sales or as gross profits? A. Gross profits—the unit factor. Q. That was gross profits? A. I say the unit factor using it as a basis or a working agreement.''

Elsewhere he testified: ''The agreement was based naturally on the only figures that were available, and supplied to me by Mr. Rodel: whether he used the term 'gross' only, or 'gross sales' or 'gross profits' I am not certain. . . . Q. You still apparently misunderstand my question—you have alleged directly in your complaint that there was an agreement to divide amongst you salesmen one-half of the increase of the gross sales; you now say that your agreement was to divide one-half of the increase of gross profits, and I wish to know which is correct and which you rely on? A. I hate to keep repeating to you that those. are the only figures I had to work on irrespective of whatever term Mr. Rodel used. They admitted there was a gross increase under the schedule as outlined by Mr. Hall in the first instance, of twenty thousand and some odd dollars. Q. You cannot answer the question? A. As near as I can then—or put it then, it is as near as I can answer it as long as you are hinging entirely on the terms gross sales and gross profits.''

The fact, as appears from Capt. Hall's testimony, was, that the gross sales of the Star & Crescent Oil Co. for 1927 amounted to $575,875.81, that the products sold had cost it $443,456.02, leaving a gross profit, that is a profit before taking out its own running expenses, including the salaries of its salesmen and other employees, of $132,419.79. Had the differential, however, allowed by the Associated Oil Company for November and December, remained the same as for the previous months of that year, Hall found from his auditor that the gross profit would have been $4,283 more, or a total of $136,702.79. Subsequently, on closing the books for 1928, it was found that the gross sales for that year amounted to $770,358.82, while the cost of the goods sold was $645,567.36, resulting in a gross profit of $124,791.46, or less by $7,628.33 than in 1927. Computation disclosed, however, that had the same differential allowed during the first ten months of 1927 prevailed through 1928, the gross profits of the latter year would have been higher than they actually were by $32,260.56. That is, they would have been $157.052.02, and this figure has been referred to in the record as the "adjusted gross profits" for that year.

Miller, the sales manager, said of the bonus arrangement: "Captain Hall said that he had formulated some scheme to give us a bonus instead of an increase in salary. . . . It was put up to us in a rather indefinite way whether we would be satisfied with the bonus proposition."

Thereupon the following colloquy ensued: "Mr. Monroe (attorney for defendants): Pardon me—pardon an interruption there. If I might clear it up, do you mean that he said it was indefinite, or do you mean— A. No, I don't. Mr. Monroe (continuing) —it was indefinite to you from what he said? A. Yes, that is right. Mr. Monroe: I see— thank you. By Mr. Sanders (attorney for plaintiff): Q. You heard his testimony this morning, did you not, Mr. Miller, about this conversation in relation to a bonus? A. Yes, sir. Q. Did you hear that? A. Yes, I heard it. Q. And does your recollection agree with him, that the bonus was to be computed . . . on the same cost basis . . . of 1927 as it was in 1928, and on the same factor of sales? A. Yes, sir."

As will be observed, there is embodied in the question last answered an assumption that Capt. Hall had testified to an

agreement with the salesmen that, in figuring their bonus, the cost to the *Star & Crescent Oil Co.* of the goods that it sold should be treated as the same in 1928 as in 1927, whereas what Hall actually testified to was not that, but rather that the ratio for 1927 between the sales cost and the gross profits would be applied to the gross profits for 1928, and if the resulting figure exceeded the actual 1928 sales expense, the salesmen would be allowed the difference, to be divided among them as a bonus.

When, therefore, Miller testified to his agreement with what Hall was assumed to have testified to, he expressed an agreement with testimony that Hall had in fact not given. Laying aside for the moment, however, the question of how, for the purpose of figuring the bonus, the "gross profit" for 1928 was to be ascertained, it is true that Miller's testimony agreed with Hall's, about the next steps to be taken in the computation. Asked what Hall had proposed "as to what basis of sales cost would be used to calculate the bonus", Miller said: "The basis was to be the gross profit, the relationship or ratio between the gross profit of 1927 against the sales cost, which included the salary of the salesmen only—the same ratio was to be adopted in 1928."

Miller, thereafter, was asked: "Have you made a calculation based upon your knowledge of the bonus agreement, using Mr. Hall's figures of those sales, to calculate what the bonus division should be?" to which he answered: "Roughly I have, yes." Thereupon, he gave the substance of a calculation made by him, based on the idea that the parties had agreed that the relationship between the cost of the goods for 1927 to the selling prices of the goods for that year should be treated as being also the relationship between the costs and the selling prices for 1928, notwithstanding that in truth the proportion of costs for the latter year was higher, owing to the lower differential then prevailing, that is, that the parties had agreed to treat the gross profits for 1927 and 1928 respectively as having been what they would have been had the differential not been lowered, and to then arrive at theoretical figures for the "adjusted" gross profits of 1927 and of 1928 respectively, and after that to figure out the ratio that the sales costs of 1927 bore to such "adjusted" gross profits for that year, and to apply that ratio to the

"adjusted" gross profits for 1928, and, if the result were a greater sum than the actual sales costs of 1928 (treated by Miller for the purpose of this calculation as having in fact been the same that he claimed that they were in 1927), to divide the difference among the salesmen. He deducted from the actual sales for 1927, amounting to $575,875.81 the actual costs for that year of $443,456.02 (misstated by him as $444,456.02), which left a profit of $132,419.79. To this he added theoretical additional profit which would have been realized had the differential not been lowered for November and December of 1927, amounting to $4,283, and thus obtained $136,702.79 as the "adjusted" gross profit for 1927. He then took $13,320 as being the sales costs for that year and figured that to be .0982 of the $136,702.79. Thereupon, he deducted from the actual sales for 1928, amounting to $770,358.82, the actual cost of the goods for that year, to wit, $645,567.36, resulting in an actual profit of $124,791.46 (misstated in the transcript as $134,791.46), to which he added a theoretical additional profit for 1928 which would have been realized had the original differential remained in force, of $32,260.56 (based on the theory that a 1927 relation of .7718 between the costs and sales should be applied to the 1928 sales), resulting in adjusted gross profits for 1928 of $157,052.02 (though counsel for respondent now say in their brief that the ratio used ought to have been .76261 instead of .7718, which mistake, however, they say worked against their client). Had Miller carried out the formula by then applying the ratio .0982 to the $157,052.02 the result would be $15,422.50. Deducting from that the 1928 sales cost of $13,320, there would remain a difference divisible among the salesmen as "bonus" of $2,102.50. However, he in fact departed from his formula, for after having once, by his use of the figure $32,260.50, taken credit for 1928 for the added profits that would theoretically have resulted had the differential of the first ten months of 1927 remained in effect during 1928, he, instead actually of applying the ratio .0982 to the resulting "adjusted" gross profits of that year, proceeded first to "adjust" them a second time by figuring that, but for the drop in the differential, the cost of the goods sold in 1928 would have been only $594,543 and that the deduction of this figure from the $770,334.93 (referred to by him in that connection as

$770,000) would leave a (second adjusted) gross profit of "roughly" $175,000 (actually $175,791.93) to which he applied his ratio of .0982, concluding that the "sales allowance for 1928" should be the resulting figure of $17,272. (It would really have made $17,262.76.) From his $17,272 he deducted the sales cost for that year of $13,320, and concluded that there was a difference of $3,942 (the subtraction would actually leave $3,952) "the portion gone into bonus". To this $3,942 he added $1,350, being "nine months of Eckles' salary" and thus obtained a total of $5,292 as the final amount to be divided among the remaining four salesmen additional to their regular salaries for 1928. When he had given his final result he was asked by respondent's counsel: "Now according to your understanding of the bonus arrangement that Mr. Hall entered into with yourself and the other salesmen, was that the sum that was to be divided at the end of the year?" He responded: "That was approximately the sum as I figured it, that was to be divided, plus Eckles' salary which would be included."

The following passages from Miller's testimony on cross-examination, however, undoubtedly show that he had difficulty in stating the basis proposed by Hall and on which he thinks the salesmen agreed for figuring the bonus: "A. We was to take the ratio of sales cost, which included the salary of the salesmen, and arrive at the ratio of the total cost, and gross sales, and use that same ratio figuring the 1928 sales. That ratio, as I testified, was .0982. It is the ratio of the sales expense to the gross sales or profits, if you want to call that that . . . Q. Well, can you tell me what was said by Capt. Hall, did he say the ratio between the salesman's costs and the gross sales, or did he say the ratio between the salesman's cost and gross profits? A. It is impossible for me to answer that question. It is too long ago to remember. Q. You don't know which it was, you can't say now which it was, can you? A. I cannot say what word he used, no sir. Q. Well you realize with me, do you not, that there is a tremendous difference between the two terms? A. Yes, I understand the difference. . . . Q. So far, then, as your own independent recollection is concerned, Mr. Miller, you would not have today a sufficiently definite recollection of that conversation that you could from that recollection figure out a formula of what the bonus would

or would not be? A. I could not tell you whether the word 'sales' or 'profits' was used in that meeting, but I can tell you what we understood. Q. Well I am not trying to get that . . . ''

Proceeding, he says that in the discussion about fixing the basis for the bonus something was said about the figure of $136,000, which was discussed as ''gross sales'' though ''using the proper definitions of sales, it was an absurdity of course''. He had never heard, however, until the moment that he testified, that the $136,000 was a figure obtained by any ''adjustment'' whereby approximately $4,000 entered into the calculation. ''That was not mentioned.''

The only other witness who testified about what was said between Hall and the salesmen when the bonus arrangement was made was the salesman Murray, who simply confesses that he never did understand the basis proposed.

There is no claim that respondent's regular salary as a salesman remains unpaid in whole or in part. The present action is brought to recover additional compensation under what are claimed to have been express agreements. There is no question of a *quantum meruit* involved. ▉ It is, of course, true that the consent of parties to a contract must be mutual (Civ. Code, sec. 1565) and that it is ''not mutual unless the parties all agree upon the same thing in the same sense'' (Civ. Code, sec. 1580), and as was said in *German Sav. & Loan Soc.* v. *McLellan,* 154 Cal. 710, 716 [99 Pac. 194]: ''There can be no contract unless the minds of the parties have met and mutually agreed,'' and a contract that has but a single object which is so vaguely expressed that the meaning is unascertainable is wholly void (Civ. Code, sec. 1598; *Sutliff* v. *Seidenberg, Stiefel & Co.,* 132 Cal. 63 [64 Pac. 131, 469]). ▉ It is also true that ''a burden corresponding to that of proving the existence of the contract exists as to the proof of its terms'' (13 C. J. 757). But it does not follow that there never was a contract because the memories of witnesses have become in a degree uncertain about what were its terms, nor does it follow that all of its terms need be established out of the mouth of any single witness if, from all the evidence, the court can find a definite proposition as having been made, understood on both sides when it was made, and accepted, even though at some later time no one witness can recite it in all its

particulars. ■ Certainly, where a contract was evidently made for the rendition of services for some agreed compensation and the contract is no longer executory on both sides but the services stipulated for have been performed, the court should regard with caution a contention that the arrangement to pay for them was either so vague or so imperfectly understood as to be unenforceable. We have, of course, quoted only in part the testimony of the witnesses who heard the proposition, whatever it may have been, that Hall made to the salesmen and which, according to respondent, they originally accepted. But, even at the cost of prolonging our quotations beyond what are usual in an opinion, we have set out enough to exhibit the substance of what the trial court had before it in deciding whether the parties made any intelligible arrangement and if so what it was. In our judgment the testimony of each of the witnesses other than Hall shows beyond cavil that, by his own admission his recollection of the formula agreed on for figuring the bonus was sufficiently vague so that it would be unsafe to accept it without comparing it with Hall's testimony. It does not necessarily follow, however, that the trial court was bound to accept Hall's version *in toto,* or to refrain from correcting Hall's statement of the formula, in any particular in which that might seem to it to require correction, by adding, from the recollection of the other witnesses, elements on which it believed their recollection more reliable, such, for example, as the intention to apply the 1927 cost basis of goods to the goods handled in 1928.

In respect of what is counted on in the complaint as a distinct agreement to divide Eckles' salary among the other salesmen in the event they divided among themselves his work, there is a sharp conflict in the testimony. According to Sieck the original bonus arrangement was the result of an initial conference between Hall and the salesmen in January, 1928, but was formulated and agreed upon early in February, Eckles being present and a party to it. Miller thinks that there was one talk late in January or early in February, another in the latter part of February and a third one about the middle of March, that Eckles was present at all of them and that it was at the March meeting that the bonus was agreed on. There is no dispute that Eckles left about the first of April. Sieck and Miller agree that the

talk about dividing his salary occurred after that and was an arrangement wholly distinct from the original bonus arrangement and additional to it. Hall, on the other hand, says that no mention of any bonus to anybody was made until some time in April, after Eckles had left, at which time the original and only bonus agreement was made; that there never was any agreement about dividing Eckles' salary, as such, except that out of what had been his allowance for gas and oil of $65 per month it was agreed that each of the remaining four salesmen, Miller, Hagan, Murray and Sieck, should be allowed $15 a month to cover their increased disbursements for those purposes in taking over Eckles' territory, but that all the understanding that there was about any further division of Eckles' salary was the suggestion and realization when the bonus agreement was made, that Eckles having gone, if nobody had to be employed in his place his going would curtail the sales expense and thereby automatically increase whatever bonus might be payable under the general arrangement. Murray's testimony on this phase of the case is to the same effect as Hall's.

In this conflict of the evidence, if it can be ascertained from the record what the court found the fact to be about the existence or nonexistence of the separate agreement asserted by the respondent for the division of Eckles' salary, its finding on the subject will be binding on this court, and that will be so notwithstanding that it is in some sort true, as counsel for appellants say, that ''had that been the plan and had the bonus been earned, the salesmen would not only have had the advantage of Eckles' salary as affecting the amount of the bonus, but would have received it again by reason of the division''. As a matter of fact, however, Miller, in arriving at his figures, avoided this particular duplication, for, in his deduction of the 1928 sales cost from his supposed sales allowance for that year of $17,272 he treated the sales costs as though they still included the Eckles' salary for all of that year and, therefore, refrained from increasing the bonus figure by their deduction. There is no actual doubt that the court found the arrangement to divide Eckles' salary to have been an agreement subsequent to the bonus agreement and additional to it, for it was so alleged both in the original complaint and the amendment

thereto, and the court found all the allegations of the complaint as amended to be true except as it otherwise specified, and these allegations were not so excepted.

With respect to the bonus agreement, if it was in the form originally claimed by respondent or even in the form testified to by Hall, appellants assert that it would be a "mere promise to give a gratuity" and "void as unsupported by any consideration", and in support of that contention they rely on *Russell* v. *Johns-Manville Co.*, 53 Cal. App. 572 [200 Pac. 668], and certain Georgia cases cited therein, and point out that there is a "distinction between an original employment by the terms of which a man is promised as compensation a certain monthly sum plus a certain interest or percentage of profits in the nature of a bonus or commission and a case . . . where during the course of the period in question there is a mere promise that if certain profits develop, a certain bonus will be paid"; that in the former class of cases, illustrated by *Roberts* v. *Mays Mill*, 184 N. C. 406 [114 S. E. 530, 28 A. L. R. 338], and *Redd* v. *Williams Radiator Co.*, 112 Cal. App. 353 [296 Pac. 676], "the agreement to pay a commission or percentage, even though referred to as a bonus is a part and parcel of the agreement for compensation" and good as such, whereas, in the second class of cases, being *nudum pactum*, the agreement "is not enforceable at law". We do not know whether they wish to be understood as going so far as to make the same contention with respect to the asserted separate agreement in the instant case to divide Eckles' salary or not. In any event, it is our opinion that the distinction, though a perfectly valid one, does not assist them in either branch of the present case. In *Russell* v. *Johns-Manville Co.*, *supra*, and the cases relied on therein, it does not appear that the parties claiming the right to the bonus either bound themselves to do, or in fact did, anything more than they were before the bonus was promised them bound by the terms of their employment to do, so long as they continued in the employment. As was said in *Davis & Co.* v. *Morgan*, 117 Ga. 504 [43 S. E. 732, 733, 97 Am. St. Rep. 171, 61 L. R. A. 148], "if there had been any change in the hours, services, or character of work, or other consideration to support the promise to pay the increased wages it would have been enforceable". In the instant case, it was asserted in re-

spondent's testimony and, in view of the decision rendered, must now be deemed true, that, following the bonus agreement the salesmen frequently worked Saturday afternoons and Sundays and at night, none of which they had done before, that they succeeded in a "gas war" "by working to eight and nine and ten at night", and that they spent money of their own to entertain customers and prospective customers. All of this counsel for appellants assert to be immaterial, citing 39 C. J. 157, to the effect that "in the absence of a special agreement therefor an employee cannot recover extra compensation for extra work performed within the scope of his employment", and citing the same work and various cases to the point that there is a presumption that "the employee volunteers such services, or that the salary or other compensation provided for in the (original) contract is intended by the parties to compensate him also for the extra work". Of the correctness of these principles we have no doubt, but the essence of the respondent's case here is the claim, which in view of the decision below must now be deemed established, that there was precisely such a "special agreement", to the effect that, if during the unexpired part of 1928, the salesmen should, through "additional" efforts produce for that calendar year the result contemplated in the bonus offer, the bonus would be paid. ■ The circumstance that they did not bind themselves to do so is beside the point. If the offer was made, and acted on by them while still in effect, and the results were obtained, the contractual obligation to pay the bonus follows, and is just as much in consequence of a "special agreement" as though the "special agreement" were bilateral from its inception. The same considerations are applicable to the other arrangement on which the respondent counts, to divide Eckles' former salary among the salesmen should they cover his territory and obviate the necessity of employing anyone else to take his place.

Referring to the findings and judgment appellants' counsel say "Recovery was allowed for $1,323. No one knows how the court arrived at that figure", and that "we do not know . . . whether the trial court concluded that plaintiff was entitled to a portion of Eckles' salary or not or whether the entire amount allowed was bonus". The record, as we have recited it, leaves us in no such doubt. That

the trial court accepted Miller's formula, his computations, with whatever errors there are therein, and his final figure of $5,292 as the aggregate divisible among the salesmen over and above their 1928 salaries is plain, for it awarded respondent precisely one-fourth of that sum, or $1323.

We have hereinbefore expressed the view that the trial court's judgment cannot be sustained without in some degree accepting Hall's testimony about the bonus formula contemplated, but have pointed out that this does not mean that the trial court was not at liberty to accept as true whatever it believed that Sieck and Miller did accurately recollect about the formula, and to use that in amplifying or correcting Hall's account of the matter. The witnesses differ, however, on other matters than the formula. There is a dispute about what the 1927 sales costs were. Capt. Hall gives them from the auditor's books as $9,805.32 and those for 1928 as $11,770. For 1928 the salaries of the five full-time salesmen would have aggregated $13,320 had Eckles remained. Sieck and Miller put the sales costs for 1927 at that figure—$13,320, on the basis of Miller's testimony that there was an average of five salesmen occupied with the work in his department in that year. They make no claim that this is other than an approximation. Whether it is closer to the fact than the $9,805.32 given by Hall will depend on how much if any of such 1927 compensation as may have been paid to Bruington, Speilman, Johnson and the truck drivers who worked part of their time in trucking jobs, is attributable to the department in which respondent worked. Assuming, however, in support of the judgment that the trial court believed the 1927 sales costs to be all of $13,320, if, to avoid duplication those for 1928 were, in accordance with respondent's procedure and Miller's plan, taken as still being $13,320 also, as though Eckles' salary were paid for the whole year, it would still follow that upon the basis of gross profits actually realized there could, upon Hall's formula, be no bonus payable because, instead of showing an increment the gross profits, as already seen, dropped from $132,419.79 in 1927 to $124,791.46 in 1928.

To show any bonus computed with relation to the gross profits to be payable, therefore, respondent must necessarily have recourse to the "adjustment" of such profits

already discussed. Appellants contend that the evidence will not permit this to be done and the record must, therefore, be further considered with that question in view. Hall's statement on that subject is as follows:

"Our gross profits did not increase, our gross profit was less for 1928 than it was for 1927. In explanation of that I would like to say that there was a change of differential in the amount allowed us by the Associated Oil Company on gasoline between 1927 and 1928, *and while my agreement* with the salesmen was on the gross profit I wanted to be fair with them. There was nothing said about this at the conference, but in order to be fair with them in computing their bonus, if any, I allowed the same rate of profit for 1928 as we had for 1927. We did not enjoy it, but I allowed it so far as the calculation of the salesmen's salaries was concerned, and if that same return had been applied in 1928 that was in 1927 it would have increased our gross profits."

This was tantamount to saying that the consent by the Star & Crescent Oil Co., for the purpose of figuring the bonus, to make the "adjustment" by applying to the 1928 transactions the 1927 differentials, had nothing to do at all with the initial arrangement about the bonus and was not mentioned when the bonus was agreed on but was decided on by the company at some later time; not as anything to which the agreement gave the salesmen any right, but as a concession in the nature of a gratuity to them.

Hall otherwise expresses the same idea as follows: "There was nothing said at the time about any differentials in gasoline; I wanted to be fair, and I gave them the advantage of the gross profit that I never received at all."

As against this, Sieck, when giving in his deposition his version of Hall's bonus proposition, quotes Hall as saying at the time the arrangement was made that "the gross income of 1927 was about $136,000.00", which, as we saw was in fact greatly less than the gross sales for that year but more than the gross profits were unless an adjustment for the November and December diminution in the differential were made and a very rough approximation to what such profits would have been if the adjustment were made. On the trial, as has been seen, Sieck quoted Hall as including in his proposition that the "cost factors of 1927

would obtain for 1928'', and repeatedly mentioned the figure of $136,000 as gotten from Hall or ''given us by Hall and Rodel'', without any clear statement of what he understood that Hall meant by it. The only other direct testimony on the subject came from Miller who, as already noticed, also said that when the bonus was proposed the figure of $136,000 was discussed, though he has difficulty in saying to just what point it was mentioned, but who went on to deny that anything was then said about its being an ''adjusted'' figure, and to deny that anything was said about its involving an adjustment of ''$4,000 approximately'' and to say that he never heard of that adjustment until the morning on which he was testifying. Miller also testified, as we saw, that his computation was according to his ''understanding of the bonus arrangement that Mr. Hall entered into'' with himself and the other salesmen, and we will take notice of the fact that persons unaccustomed to stating mathematical propositions in abstract terms not infrequently comprehend, remember and are able to work out on paper, formulae that they are at loss to express in words. Miller also said that he was at some time told by Hall that the change in differential would be ignored so far as its working to the detriment of the salesmen was concerned but he cannot say when that was told him and does not claim that that conversation was any part of the bonus agreement as originally made. Hall testified that when it later came to calculating what the salesmen were entitled to be ''allowed'' he used in that calculation what was in fact the difference between the gross profits for 1928, adjusted for the differentials and those for 1927 so adjusted, which would in fact be the difference between $157,052.02 and $136,702.79, actually amounting to $20,349.23, but roughly referred to in the record as $20,000. And in his testimony in that connection appears also the following:

''Q. But for the purpose of calculating in this lawsuit, the bonus due, you are willing to agree to the figures $20,000.00? A. Yes, sir. Q. So we don't have to change that understanding with that explanation? A. No, sir.''

It must be said that, looking at the whole record, about all that there is to support any finding by the trial court implicit in the decision that the suggestion about using the 1927 differential for 1928 was any part of the bonus agree-

ment as originally made, is the fact that in some shape or form Hall originally mentioned the figure $136,000, together with Sieck's quotation of Hall to the effect that "the cost factor for 1927 would obtain for 1928", coupled with Miller's statement that his computation was in accordance with his "understanding of the bonus arrangement" and with Hall's admitted use of the differential adjustment in subsequent calculations and his testimony just referred to. We cannot, however, say as a matter of law that this foundation, though not a particularly strong one, is too unsubstantial to support the somewhat elaborate structure of adjustments for differentials built upon it. The differentials actually affected the cost of the goods and if the 1927 costs were to be used in 1928, it would only be by calculating out the change in differentials. ■ As respects Hall's statements last quoted of the figures he is now willing to accept, appellants' counsel correctly say that being represented by attorneys he was in no position to make at the trial any binding stipulation. (*Board of Commissioners* v. *Younger*, 29 Cal. 147, 149 [87 Am. Dec. 164].) Nevertheless, the court had the right to consider his attitude at the trial for whatever light it might think that shed on what Hall conceived that he had obligated his company to under the original bonus agreement.

■ We think, then, that we must uphold, as not wholly unsupported by evidence, the implied finding of the trial court, necessarily involved in its decision, that the arrangement for the adjustment of differentials was part of the original bonus agreement, that is, that even though not originally expressed, it was included in an understanding that the "cost factors" of 1927 should be applied in 1928, and that, in determining whether by the use of Capt. Hall's formula a bonus is shown to be payable, the "gross profits" must be treated as those which would appear after the adjustment for differentials. So considered, Captain Hall's formula is not different from that assumed by the witness Miller, if we eliminate Miller's mistakes in calculation and particularly his duplication in differential adjustments. Even so, as appellants' counsel point out, if Hall's figures of $9,805.32 for the 1927 sales costs were accepted, no right to a bonus would result, for it would then appear that there was such an increase in sales costs in 1928 over those for

1927 that the application of the formula would produce none. But the trial court having found, in effect, upon conflicting evidence, that the 1927 sales costs were actually $13,320, we cannot disturb that finding. On the other hand, respondent's counsel, in amending their complaint to conform to the trial court's acceptance of Miller's figures, followed Miller's calculation and alleged that the purchase price of the products upon which the profit for the year 1927 had been made, was 77.18 per cent of the gross amount received for the sales of said products, and say now that the percentage is in error and should have been 76.261 per cent but now express themselves as willing to waive that correction. We will take them at their word.

Computation shows, however, that Miller's use in his calculation of .0982 as the ratio between the sales costs of 1927 and the adjusted gross profits of that year was wrong and that on the basis of his own figures the ratio would be .0974. This applied to the adjusted gross profits of $157,052.02 for 1928 would produce a result of $15,296.87. The subtraction from that of the $13,320 taken to be the sales expense for that year, would leave $1976.87 as the aggregate due the salesmen under the original bonus agreement after the elimination of Miller's duplication of the differential adjustment. Since we are bound to accept the view taken by the trial court that the agreement to divide Eckles' salary among the remaining four salesmen was a separate arrangement, there must, therefore, be added the resulting $1350, making the aggregate to be divided among the four salesmen $3,326.87, from which it results that the respondent is entitled to one-fourth of that amount or $831.72 instead of $1323, as found by the trial court.

■ Certain other contentions for appellants require brief notice. It is claimed that the case made by the evidence was so wholly different from one alleged in the original complaint as to result in a complete and fatal variance, that, therefore no amendment to conform to the evidence was in order or should have been allowed but that the amendment in fact set out an entirely new cause of action to which opportunity should have been given for appellants to have pleaded the statute of limitations, and in support of their position counsel cite *Gillin* v. *Hopkins,* 28 Cal. App. 579 [153 Pac. 724], where a promise to pay

$4,500 for certain services was alleged and instead a promise to deliver certain shares of stock or in default thereof pay what was their market value aggregating $4,500 was proved. In holding this a failure to prove what had been alleged the court viewed the action brought as one upon a stated indebtedness and the cause of action proved as one for damages for breach of a contract. No application to amend appears to have been made. It is manifest that the situation there was not the same as here. Here the original complaint counted on an indebtedness in money arising out of an agreement to pay a bonus and a separate agreement to divide .Eckles' salary. The amendment also counts on an indebtedness in money arising out of the agreement to pay the bonus and a separate agreement to divide Eckles' salary. It may be conceded that the difference was such that the complaint as originally filed required amendment before it would support the judgment rendered. But there is a distinction between the variance that makes an amendment necessary and such a failure of proof (Code Civ. Proc., sec. 471) as makes an amendment improper at all. "A plaintiff may not abandon the entire case made by his pleading and make a new and different one by way of amendment but so long as the cause of action set out in an amendment is not entirely foreign to the original action and the relief sought arises on the same general state of facts the amendment is proper and within the discretion of the court." (21 Cal. Jur., sec. 136, pp. 198, 199; *Ford* v. *Ford*, 44 Cal. App. 415, 420 [186 Pac. 164]. See, also, *Frost* v. *Witter*, 132 Cal. 421, 424 [64 Pac. 705, 84 Am. St. Rep. 53].) A greater liberality of amendment is ordinarily permitted before the trial under sections 472 and 473 of the Code of Civil Procedure than at the trial where an amendment may only be allowed (Code Civ. Proc., sec. 470) if the variance is not material in the sense of having "actually misled the adverse party to his prejudice in maintaining his action or defense upon the merits". (Code Civ. Proc., sec. 469; *Frost* v. *Witter*, *supra*, pp. 423, 424.) We do not think, however, that there is any indication that appellants were so misled here. In the reply brief for appellants' numerous authorities from other jurisdictions are cited in the effort to show that the variance in the case at bar precluded any effectual amendment. With some of

these cases we are, in respect of the situations there involved, in agreement and others are not law in California. It is true here that there is a wide difference between the manner in which the original complaint stated that the bonus was to be computed and the manner in which the trial court must be deemed to have found that it was to be figured, but that does not, in our opinion, so completely alter the case as to preclude amendment or make the complaint as amended obnoxious to a statute of limitations that had not run when the action was originally filed.

■ The complaint is made that though appellants moved the trial court to strike out the amendment to the complaint that court, after hearing the motion, omitted to rule on it but filed its findings and entered its judgment without doing so. We find no other reference to any such motion in the record than a specification in appellant's notice to the clerk to cause the reporter's and clerk's transcripts to be prepared requesting that there be included in the latter a "notice of motion to strike the amendment". No such notice, however, is included in the transcript, nor do any minutes there appear showing that any such motion was actually made to the court. Even if it were, we cannot say that the failure to rule on it has caused such a miscarriage of justice as under section 4½ of article VI of the state Constitution would of itself justify a reversal.

■ Complaint is made that the findings are too indefinite to disclose what the basis of the judgment rendered by the trial court was, but they do, with certain exceptions, find all the allegations of the complaint as amended to be true and we therefore think that they are not amenable to that criticism. We have no difficulty in ascertaining what the court did.

■ The order denying motion for new trial, not being appealable, the attempted appeal therefrom is dismissed.

As to all of the defendants other than the Star & Crescent Oil Co. the judgment is reversed and as against that corporation the judgment is modified by the reduction of the plaintiff's recovery from $1323 to $831.72, and as so modified, is affirmed.

Barnard, P. J., and Marks, J., concurred.