Filed 3/26/24  Floriani Engineering v. Aegean Stoneworks CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

|  |  |
|---|---|
| FLORIANI ENGINEERING, INC.,<br><br>    Plaintiff and Appellant,<br><br>    v.<br><br>AEGEAN STONEWORKS, INC.,<br><br>    Defendant and Respondent. | G061698<br><br>(Super. Ct. No. 30-2019-01061892)<br><br>O P I N I O N |

Appeal from a judgment of the Superior Court of Orange County, Lon F. Hurwitz, Judge.  Reversed.

John J. Freni for Plaintiff and Appellant.

The Vanderpool Law Firm, Douglas B. Vanderpool and Brooke L. Bove for Defendant and Respondent.

\*         \*         \*

In this breach of contract case, the issue boils down to who is responsible for damages caused when the placement of six cranes in a warehouse turned out to be too close to one another, causing collisions and resultant economic damage due to the inability to use the cranes to their full extent. After Floriani Engineering, Inc., doing business as Facilities Engineering (Facilities Engineering), installed the cranes, Aegean Stoneworks, Inc. (Aegean), refused to pay any amount of the contract, claiming Facilities had not fully performed its obligations. Facilities Engineering sued on the contract. The court found the contract was unenforceable due to a mutual mistake of fact and awarded Facilities Engineering the reasonable value of its services under a common count, which was less than the full contract amount. Because the court voided the contract, Facilities Engineering could not move for attorney fees under the contract. Facilities Engineering appealed, contending the trial court erred in finding a mutual mistake and refusing to enforce the contract.

We agree with Facilities Engineering that there was no mistake of fact in this case. The parties were clear on the facts. What was less than clear was the terms of the contract—in particular who would be responsible for determining the precise location of the cranes' footings. But an ambiguity in a contract does not create a mistake of fact even when the parties have different understandings of the term, as is often the case. It is possible for a contract to be so vague that the entire contract is void. However, where, as here, the principal terms of the contract (to procure and install six cranes) are entirely clear and ascertainable, the contract is enforceable, and the court is required to construe ambiguous terms in the contract utilizing the various legal doctrines suited to that task. Consequently, the contract was enforceable. As to the ambiguous terms concerning the footings, the interpretation of those terms revolves around the resolution of disputed extrinsic evidence. Accordingly, we are unable to interpret the contract on appeal and will reverse and remand for a new trial.

FACTS

Facilities Engineering is a California licensed general engineering contractor. Among other services, Facilities Engineering sells and installs commercial cranes. Vincent Baroldi is one of Facilities Engineering's two principals.

Aegean produces products fabricated from stone and artificial materials, such as counter tops. Aki Vourakis is Aegean's chief executive officer and one of its principals, and Kiriakos "Kiri" Alyousef is its general manager.

In 2018, Vourakis decided to expand Aegean's business by moving to a larger facility. Aegean's new warehouse was approximately 10,000 square feet larger than its prior warehouse. Vourakis determined Aegean would install seven major pieces of equipment (three cutting machines and four edging machines). He prepared a CAD (computer-aided design) drawing of the layout that included approximate crane locations and spans.

At the beginning of May 2018, Baroldi from Facilities Engineering met with Vourakis and Alyousef at Aegean to discuss selling cranes to Aegean for the new warehouse. Afterward, Baroldi e-mailed a proposal for the sale and installation of seven cranes, which became exhibit 1 at trial. Exhibit 1 consists of an e-mail in the nature of a cover letter, and a formal proposal on Facilities Engineering's company letterhead.[1] In the e-mail, Baroldi stated, "Note that this proposal is 'turnkey'—we will install all of the jibs [i.e., cranes] and equipment with our own men and equipment." The formal proposal contained the following language: "Per your request we installation [*sic*] labor and equipment in this proposal." "The footings are to be provided by others per our design." In the line item description of the services to be provided, each crane has language similar to the following: "Footing Size 5'-0" x 5'-0" x 4'-0" [BY OTHERS]." The formal proposal included a sheet of "General Conditions." The general conditions

---

[1] There were two proposals on company letterhead, but they were almost entirely identical, and the differences are immaterial for purposes of this appeal.

included the following: "Facilities Engineering . . . will furnish such drawings as necessary for the work."

Over the next two weeks the parties met twice to refine the pricing and crane options. At one of those meetings, Vourakis showed Baroldi the CAD drawing. According to Vourakis, Baroldi went into the warehouse, stood where the cranes were to be installed, and, using a laser measure and tape measure, applied blue tape to the ground to indicate precisely where the footings of the cranes should be installed. In an e-mail sent after one of the meetings, Baroldi thanked Vourakis for "finding his laser."

Baroldi testified that he did no such thing. According to Baroldi, determining the layout and position of a crane is a service that he offers, but he would have charged an additional $5,000 to $10,000 and the charge would have showed up under the description "engineering" on the bid. He also testified that he would never mark the placement of footings with tape, because tape can be intentionally or unintentionally removed. Instead, he uses a chalk line and on top of the chalk line, a clear spread paint to mark the location of the footings. Facilities Engineering called an expert witness who testified that it was standard industry practice to charge extra for such services, which was not done in this case.

After negotiating some additional discounts, on May 15, 2018, Baroldi e-mailed a third revision to the quote (dubbed REV3) and some payment terms, which Vourakis accepted. The contract amount was for $64,081. The contract consisted of the original proposal as ultimately modified by REV3, the general conditions, and a May 16, 2018 e-mail exchange that clarified some of the payment terms.

In accordance with the parties' agreement, a third party concrete contractor did the actual concrete work to install the footings utilizing a design provided by Facilities Engineering. The third party contractor testified that he had a five minute meeting with Baroldi, and that Baroldi did not show him where the crane footings were supposed to be installed. Rather, Vourakis said he had determined the location of the

4

crane footings based on proximity to his working tables. After the concrete contractor had finished installing the crane footings, Vourakis told the concrete contractor that he needed to relocate one of the cranes and asked the contractor to move the footing, which involved demolishing the existing footing and excavating a new footing. Baroldi had no involvement in moving the footing.

The cranes were installed by August 9, 2018. However, a problem arose: the cranes shared "airspace" and could collide with one another or with the wall of the warehouse. As a result, Facilities Engineering cut down the length of three of the cranes. The cuts were relatively short—one foot, six inches, and four inches. But that created another problem: the cranes no longer reached the appropriate drop off points, resulting in increased labor expenses for Aegean. As a result, Aegean refused to pay on the contract, taking the position that the installation was incomplete. Aegean offered to settle the matter for $40,000, which Facilities Engineering rejected.

In April 2019, Facilities Engineering sued Aegean for breach of contract, common counts, and unjust enrichment. In June 2019, Aegean cross-complained for breach of contract and negligence. The matter proceeded to a bench trial, following which the court issued a statement of decision.

The court concluded that the parties' contract was unenforceable due to a mutual mistake of material fact. The court focused on Baroldi's use of the term "turnkey" and concluded the parties had different understandings of that term as it pertained to who was responsible for determining the precise location of the footings. The court awarded Facilities Engineering unjust enrichment damages of $53,195, which was the contract price for the cranes minus the cost to relocate three of the cranes (approximately $10,000), plus $19,815.20 in prejudgment interest, for a total of $72,908.21. The court awarded nothing on Aegean's cross-complaint. Facilities Engineering appealed from the ensuing judgment.

5

The court ruled that the contract was unenforceable as a result of a mutual mistake of material fact. But what the court actually described was an ambiguity in the contract, coupled with differing subjective understandings of what the contract required with regard to placement of the footings. Mistake of fact is not the applicable legal doctrine under these circumstances.

"Mistake of fact is a mistake, not caused by the neglect of a legal duty on the part of the person making the mistake, and consisting in: [¶] 1. An unconscious ignorance or forgetfulness of a fact past or present, material to the contract; or, [¶] 2. Belief in the present existence of a thing material to the contract, which does not exist, or in the past existence of such a thing, which has not existed." (Civ. Code, § 1577.) This section has been interpreted to refer to "objective existing fact." (*Hedging Concepts, Inc. v. First Alliance Mortgage Co.* (1996) 41 Cal.App.4th 1410, 1421 (*Hedging Concepts*).) Where "the parties had differing subjective understandings of the contract from the inception[, t]his does not constitute a 'mistake' for rescission purposes." (*Ibid.*)

We are not aware of any case law that deemed an ambiguous contract provision a mistake of fact, and neither the trial court nor Aegean has cited such a case. To the contrary, that proposition was expressly rejected in *Hedging Concepts*. There, the court reasoned that a "subjective misinterpretation of the contract" is "at most a mistake of law." (*Hedging Concepts*, *supra*, 41 Cal.App.4th at p. 1421.) Yet the court went on to conclude that mistake of law is likewise inapplicable: "A mistake of law as defined by Civil Code section 1578 exists only when 1) all parties think they know and understand the law but all are mistaken in the same way, or 2) when one side misunderstands the law at the time of contract and the other side knows it, but does not rectify that misunderstanding. Neither of these two possibilities occurred on the facts found by the trial court. Clearly, each side here placed a different interpretation on the contract, hence all parties did not make the same mistake." (*Ibid.*) We agree.

6

Instead, the question is whether the contract is so vague as to void the agreement. This is a question that we review de novo. (*Okun v. Morton* (1988) 203 Cal.App.3d 805, 818 (*Okun*).) Civil Code section 1598 provides, "Where a contract has but a single object, and such object is . . . so vaguely expressed as to be wholly unascertainable, the entire contract is void." "To be enforceable, a promise must be definite enough that a court can determine the scope of the duty and the limits of performance must be sufficiently defined to provide a rational basis for the assessment of damages." (*Ladas v. California State Auto. Assn.* (1993) 19 Cal.App.4th 761, 770.)

Generally speaking, voiding a contract for uncertainty is a disfavored remedy. "'"[T]he modern trend of the law is to favor the enforcement of contracts, to lean against their unenforceability because of uncertainty, and to carry out the intentions of the parties if this can feasibly be done. Neither law nor equity requires that every term and condition of an agreement be set forth in the contract. [Citations.] The usual and reasonable terms found in similar contracts can be looked to, unexpressed provisions of the contract may be inferred from the writing, external facts may be relied upon, and custom and usage may be resorted to in an effort to supply a deficiency if it does not alter or vary the terms of the agreement."'" (*Denver D. Darling, Inc. v. Controlled Environments Construction, Inc.* (2001) 89 Cal.App.4th 1221, 1237.) We are especially mindful in this case of this bit of wisdom: "Certainly, where a contract was evidently made for the rendition of services for some agreed compensation and the contract is no longer executory on both sides but the services stipulated for have been performed, the court should regard with caution a contention that the arrangement to pay for them was either so vague or so imperfectly understood as to be unenforceable." (*Sieck v. Hall* (1934) 139 Cal.App. 279, 292.)

7

The contract here was not void under Civil Code section 1598. To the extent this contract could be described as having "but a single object," that object was to procure and install six cranes. Facilities Engineering did that. There was no ambiguity at all about it. While the location of the footing was important to the installation, the ambiguity was not so central to the contract that it vitiated the basic offer and acceptance that formed the contract. "At bottom, '[i]f the parties have concluded a transaction in which it appears that they intend to make a contract, the court should not frustrate their intention if it is possible to reach a fair and just result, even though this requires a choice among conflicting meanings and the filling of some gaps that the parties have left.'" (*Okun, supra,* 203 Cal.App.3d at p. 817.) As the Restatement on Contracts similarly explains, "[T]he actions of the parties may show conclusively that they have intended to conclude a binding agreement, even though one or more terms are missing or are left to be agreed upon. In such cases courts endeavor, if possible, to attach a sufficiently definite meaning to the bargain. [¶] . . . Where the parties have intended to conclude a bargain, uncertainty as to incidental or collateral matters is seldom fatal to the existence of the contract." (Rest.2d Contracts, § 33, com. a, p. 92.) That is the case here.

How, then, do we deal with the issue of who was responsible for determining the location of the footings? We begin by addressing Facilities Engineering's contention that the contract was not ambiguous at all, which we review de novo. (*Scheenstra v. California Dairies, Inc.* (2013) 213 Cal.App.4th 370, 389.) According to Facilities Engineering, "It is undisputed that there is not one mention of Facilities [Engineering] determining the footing locations in the contract, or for that matter, in any other pre-dispute communication with Aegean." However, what Facilities fails to fully reckon with is that the contract stated Facilities Engineering would design the footings and provide all drawings necessary for the installation. Facilities Engineering tries to explain these provisions away by arguing that "design" meant the structure of the footing, not its location, and no drawing of footing locations was

8

necessary because that was not within its scope of work. That is certainly one plausible reading of the contract. However, "'[a]n ambiguity exists when a party can identify an alternative, semantically reasonable, candidate of meaning of a writing.'" (*Benedek v. PLC Santa Monica* (2002) 104 Cal.App.4th 1351, 1357.) Another semantically reasonable reading of the contract is that the location of the footing is essential to installing the crane and thus would be included as a necessary drawing and part of the design of the footings.

Accordingly, we must consider how to resolve the ambiguity. "'The fundamental goal of contractual interpretation is to give effect to the mutual intention of the parties.' 'The mutual intention to which the courts give effect is determined by objective manifestations of the parties' intent, including the words used in the agreement, as well as extrinsic evidence of such objective matters as the surrounding circumstances under which the parties negotiated or entered into the contract; the object, nature and subject matter of the contract; and the subsequent conduct of the parties.'" (*Wolf v. Superior Court* (2004) 114 Cal.App.4th 1343, 1356, fn. omitted.) "This inquiry does not consider the subjective belief of the promisor but, rather, the 'objectively reasonable' expectation of the promisee. [Citations.] If, after this second inquiry, the ambiguity remains, 'the language of a contract should be interpreted most strongly against the party who caused the uncertainty to exist.'" (*Linton v. County of Contra Costa* (2019) 31 Cal.App.5th 628, 636.)

"'The conduct of the parties after execution of the contract and before any controversy has arisen as to its effect affords the most reliable evidence of the parties' intentions. [Citations.]' [Citation.] Thus, courts will adopt and enforce the parties' practical construction when reasonable." (*Hernandez v. Badger Construction Equipment Co.* (1994) 28 Cal.App.4th 1791, 1814.)

And here is where we run into an impassable roadblock on appeal. The record contains a rich body of evidence concerning pre-conflict course of conduct. However, much of the evidence is in direct conflict. On the one hand, Facilities Engineering presented evidence that Vourakis created a drawing to determine the locations of the cranes, which is supported by Boraldi's testimony as well as the testimony of the concrete contractor who testified that Vourakis claimed to have determined the location of the cranes. On the other hand, Vourakis testified that Boraldi determined the precise location of the footings using a laser measure and blue tape, which is corroborated by Boraldi's e-mail thanking Vourakis for finding his laser. "[W]here the parol evidence is in conflict, the trial court's resolution of that conflict is a question of fact and must be upheld if supported by substantial evidence." (*Wolf v. Superior Court* (2004) 114 Cal.App.4th 1343, 1351.) Consequently, "Where . . . a conflict in the evidence exists, it must be resolved in the trial court, as with any question of fact, before the [appellate] court can declare the meaning of the contract as a matter of law." (*Id.* at p. 1359.) In this case, the trial court never resolved that conflict, choosing instead to erroneously void the contract, which bypassed the issue of interpreting the contract. Accordingly, we must remand for a new trial to resolve this critical factual issue.

DISPOSITION

The judgment is reversed.  Facilities Engineering shall recover its costs incurred on appeal.


SANCHEZ, J.

WE CONCUR:


BEDSWORTH, ACTING P. J.


MOORE, J.