[S. F. No. 15636. In Bank.—May 27, 1937.]

F. C. DOUGHERTY, Respondent, v. CALIFORNIA KETTLEMAN OIL ROYALTIES, INC., Appellant.

William M. Abbott, William M. Cannon, Joseph F. Leonard, Michael F. Shannon and Thomas A. Wood for Appellant.

Sullivan, Roche, Johnson & Barry and Rogers, Clark & O'Brien for Respondent.

THE COURT.—Appellant, California Kettleman Oil Royalties, Inc., appeals from a judgment adverse to it rendered by the Superior Court of the City and County of San Francisco. As disclosed by the record, the facts are substantially as follows:

About the middle of November, 1920, the respondent, Dougherty, approached Washington Ochsner, appellant's predecessor in interest, in San Francisco, to solicit from him employment in connection with the selection of government oil lands, and the filing of an oil and gas prospecting permit upon such lands. For many years Dougherty had devoted himself to the buying and selling of oil, mineral and timber lands. From 1909 to 1911 President Taft had caused many prospective oil areas owned by the government, to be withdrawn from entry, including the areas involved in this action. In 1919 Dougherty visited Washington, D. C. He became friendly with one Fred Dennett, an attorney practicing before the General Land Office and formerly connected with that office. From this source, and from his own investigation, he became familiar with the provisions of certain bills then pending before the Congress providing for the reopening of some of the lands withdrawn by President Taft. He not only thoroughly familiarized himself with the provisions of this proposed legislation, but also procured from the General Land Office maps, data, and reports regarding California lands that would be open for entry when the contemplated legislation was adopted. Because of his special knowledge concerning the pending legislation, and because of his thorough knowledge of oil lands in California, he became associated with the National Exploration Company, a subsidiary of the Union Oil Company of Delaware. His contract with this concern called for him to receive 10 per cent of all oil or gas produced on lands covered by permits secured by him, plus a drawing account of $500 per month. One of the officials of this company was named Howard, with whom Dougherty and Dennett spent considerable time in Washington working out a proposed pro-

gram for entering various likely oil bearing properties. With several employees of this company, Dougherty visited various oil properties, including a visit paid to Kettleman Hills, and surveyed various potential locations. On one of these trips he established three corners of the lands subsequently covered by the Ochsner permit. The oil leasing act opening up for entry some of the withdrawn lands was passed by the Congress on February 25, 1920 (30 U. S. C. A., sec. 181 et seq.). Dougherty terminated his association with the National Exploration Company about April 1, 1920, and thereafter he undertook, on his own account, to locate citizens of the United States on the lands opened up by the act. His plan of operation was to volunteer his special knowledge and services to men interested in oil lands who desired to secure a prospecting permit. He would make available to the proposed permittee his knowledge of lands open for entry, would select the lands, prepare and file the application for the permit, advance the filing fees, and required bond premium, and would follow the application through to the issuance of the permit. In connection with his plan of operation, Dougherty had mimeographed a form of contract, prepared by an attorney, providing that in consideration for his services, upon the issuance of the permit he was to be reimbursed for the fees and costs advanced by him, and was to receive a 10 per cent share of all oil or gas produced from lands covered by the permit, after first deducting the government reserved royalty, and oil or gas used in drilling operations. It was in carrying out this plan of operation that Dougherty first met Ochsner on November 15, 1920.

Ochsner was a petroleum geologist of considerable repute. In 1910 he had drilled a dry hole in the Kettleman Hills, upon section 20—the so-called Medallion well. In spite of this failure he was convinced that the Kettleman Hills area was good oil land. Under one section of the oil land leasing law as passed in February, 1920 (30 U. S. C. A., sec. 228), prior claimants on the withdrawn areas were given a preferential right to a prospecting permit, provided application was made therefor within six months from February 25, 1920, and provided the applicant quitclaimed to the government all rights predicated upon the prior entry. On August 20, 1920, within five days from the date upon which his right to a preferential permit would have expired, Ochsner, through the

agency of Rufus Thayer, an attorney, filed an application for a preferential permit covering 480 acres in section 20. In connection therewith he quitclaimed to the government all claims based on his prior entry. After considerable negotiations with the land office this application for a preferential permit was denied on October 30, 1920, for failure on the part of the applicant to comply with the requirements of the act. It was about two weeks after the denial of Ochsner's application that Dougherty called upon him. Dougherty explained to Ochsner in detail his method of operation and the extent of his special knowledge in the field of prospecting permits, particularly as to his knowledge of lands still open for entry. At this first meeting Dougherty also explained that his charge for the services rendered would be a 10 per cent royalty in any oil or gas produced from the lands embraced within the prospecting permit secured by him. Dougherty exhibited to and left with Ochsner a copy of his regular contract so providing.

This form of contract, a copy of which is attached to the final complaint filed herein, and several copies of which were introduced in evidence, describes Dougherty as "second party" and his client as "first party". After describing in detail the services to be rendered by Dougherty, this contract provides:

"First party covenants and agrees that if and so long as oil and/or gas shall be produced and saved from said located lands or any part thereof in and by the exercise or enjoyment, by first party or any corporation or person acting or claiming through or under said first party, of the authorities, powers or rights which may be conferred by said permit or conferred by any such lease which first party may succeed in obtaining in virtue of exploratory and development work executed by him in pursuance of said permit, second party shall be entitled to receive and retain for his own use and benefit, and first party will deliver or cause to be delivered to him on or before the 15th day of each month and at such convenient point or points upon the lands from which said oil and/or gas is produced as first party may select, or such other point or points as the parties hereto may agree upon, a one-tenth share of the balance remaining of the oil and/or gas so produced and saved during the preceding month, after deducting therefrom the part thereof required by said permit or said

lease, as the case may be, to be delivered or accounted for to the United States, as royalty, also deducting the quantity of oil and/or gas which shall have been actually consumed upon said lands during said months respectively as fuel or for lighting purposes in carrying on any and all operations authorized by said permit or said lease, as the case may be, or if second party shall elect to receive payment of the value of such one-tenth share of oil and/or gas instead of the products themselves, first party will pay or cause to be paid to second party, on or before the 15th day of the months of January, April, July and October in each year, a sum equal to the fair market value of said share of the oil and/or gas so produced and saved during the three months preceding said settlement days respectively.

"It is mutually and distinctly understood, however, that first party does not intend hereby to obligate himself unqualifiedly or otherwise in favor of second party to prosecute to a final determination any application it has made or may make for the permit above mentioned or any lease of the description herein mentioned, or to accept any such permit or lease or at any time to carry on or execute, or cause to be carried on or executed by any corporation or person acting for or claiming any right or interest to or in any part of said lands through or under first party, any exploratory or development work or work of extracting oil or gas from said lands pursuant to or under either any such permit or any such lease; said parties hereby declare their mutual intention to be that all obligations and duties in favor of second party which first party hereby contracts or assumes, shall operate upon or in respect to only such oil or gas as shall actually be produced and saved from said lands by first party or any corporation or person acting for or claiming some right or interest to or in said lands through and under first party in any such permit and/or lease obtained and accepted by first party, and produced and saved in the exercise or enjoyment of such permit and/or lease; also declare that it is mutually and distinctly intended by them that first party and/or any such corporation or person acting for or claiming through or under first party, shall at all times have an unqualified power of election and decision over the matter of prosecuting to determination or abandoning any application for such permit or such lease, also over the matter of accepting or rejecting any such permit

or lease, also over the matters of commencing, continuing with, or abandoning, in whole or in part, all or any exploratory development, extraction or producing operations upon said lands, and, generally, over all matters of every name and description pertaining to or connected with the acquisition of such permit and/or lease and the exploration, development, and operation of said lands under said permit and/or lease, excepting only the single matter of delivering to second party or settling with him for the reasonable value of said one-tenth share of all oil and/or gas produced and saved from said lands, as hereinbefore specified.''

A few days after his first visit, Dougherty, at Ochsner's request, again visited Ochsner, and talked over with him the possibilities of various areas with special reference to Kettleman Hills. Ochsner asked Dougherty if a permit could be secured near the location of the Medallion well, and was informed that Dougherty could secure for him a limit permit of 2,560 acres in that area if Ochsner would sign the 10 per cent agreement. Ochsner instructed Dougherty ''to go ahead and prepare the papers''.

Dougherty returned to Ochsner's office on November 24, 1920, with a prepared power of attorney authorizing him to locate the lands in Ochsner's name, and also with certain plats and maps which disclosed the lands still open for entry in Kettleman Hills. Ochsner signed the power of attorney and gave to Dougherty certain information required by the latter to complete the application. Dougherty then left to prepare the required papers, which were presented to and signed by Ochsner on November 29, 1920. The record discloses that between November 24th and 29th, Ochsner went to Rufus Thayer, the attorney who had prepared the defective application already described, and had him prepare in Ochsner's name another application covering four sections of land in the Kettleman area. This application was signed by Ochsner November 26, 1920, and filed in the Visalia Land Office on the 29th, on the very day that Ochsner signed the application prepared by Dougherty. Ochsner signed Dougherty's application without disclosing the fact that Thayer had already filed an application for him on some of the same land. The inference is clear that the Thayer application was an attempt on the part of Ochsner to utilize the confidential information disclosed to him by Dougherty on November 24th.

This second Thayer application included two of the four sections included within the Dougherty application, and also two other sections not then open for entry. Because of this latter fact, and because of other defects in the Thayer application, it was ultimately withdrawn by Ochsner at the suggestion of the Land Office.

On November 29, 1920, Dougherty called upon Ochsner with the application fully made out, except for Ochsner's signature, with all of the required supplementary papers, and with two copies of his 10 per cent contract fully filled in except for signatures. On that date Ochsner signed all the required papers except the 10 per cent contract, telling Dougherty as to that there was no hurry and he would sign within two or three days. Thereafter Dougherty caused the application, with its supporting documents, to be properly filed and paid all the required fees. After the permit was granted Ochsner reimbursed him for these fees. Ochsner retained in his possession the two copies of the 10 per cent contract. Neither on the 29th nor at any time thereafter did he object to Dougherty to any of the provisions of this contract. The permit was issued in Ochsner's name on April 16, 1921.

Between November 29, 1920, and April 16, 1921, Dougherty met Ochsner on several occasions, and on each of such occasions asked Ochsner for the contract. Ochsner replied that was no hurry, stating that when the permit was issued he would sign the contract.

Between the date of the issuance of the permit and the end of 1921 Dougherty, sometimes in the company of Ochsner, and sometimes alone, visited many of the major and some of the minor oil companies with offices in San Francisco or Los Angeles in an attempt to interest them in drilling on the property. Many of the officials of these companies were called as witnesses and not only testified as to these visits, but some of them testified that Ochsner told them at that time that Dougherty had an interest in the property; that they were partners, etc. Several witnesses testified that Ochsner told them in the absence of Dougherty that the latter had a 10 per cent interest in the permit. Douglas Watson, an oil man associated with Ochsner in the drilling of the unsuccessful Medallion well, testified that Ochsner discussed with him the Dougherty contract; that Ochsner told him that he thought the 10 per cent was

excessive but that he had decided to go ahead, and that he had so told Dougherty; that during this conversation Ochsner exhibited to the witness a copy of the Dougherty contract. Howard Payne, a close associate of Ochsner in many enterprises, testified that early in 1921 Ochsner discussed with him the Dougherty contract, exhibited it to him and that he, the witness, read it; that the witness told Ochsner that in his opinion the 10 per cent was too high; that Ochsner replied that similar contracts had been signed by some ''very good oil people, and if it is good enough for them, it ought to be good enough for me''. It was a fact that many oil men, including Watson, had signed similar 10 per cent contracts with Dougherty. There can be no doubt, and the record clearly establishes, that Ochsner, until as late as March of 1923, clearly recognized the existence of Dougherty's claim, the extent of it, considered the obligation binding upon him, expressed his intent to be bound by it, and refused to negotiate concerning the permit without first securing Dougherty's approval. The record also shows that on many occasions during this period Dougherty and Ochsner discussed the 10 per cent contract; that Ochsner invariably promised Dougherty he would sign, but he never did.

One of the conditions of the permit was that a well must be drilled to a depth of 500 feet within one year of the date of the issuance of the permit. As this year was about to expire, Dougherty, early in 1922, with Ochsner's knowledge and consent, undertook the burden of securing and did secure an extension. Toward the end of 1922 Dougherty advised Ochsner to apply for a second extension and to use the papers prepared by Dougherty in connection with the first extension. Ochsner followed this advice and filed for a second extension. This application was pending in the early months of 1923. It was about this time that Ochsner began negotiations looking toward the assignment of the permit to the Coast Land Company. While these negotiations were pending, Ochsner telegraphed Dougherty, who was in the east, to investigate the extension application. On May 29, 1923, Ochsner again telegraphed to Dougherty telling Dougherty that he had an ''opportunity negotiate Kettleman permit from group who agree drill deep test next year. Offer overriding royalty on percentage not yet agreed and protect permits during time. State percentage of royalty I can get do you think your por-

tion for services . . . '' By the same telegram Ochsner asked Dougherty to again investigate the status of the application for an extension. Receiving no answer to this telegram, Ochsner, on June 6, 1923, again telegraphed to Dougherty stating: ''Wish to finance Kettleman now. Please answer wire week ago asking percentage your interest.'' On June 7, 1923, Dougherty telegraphed Ochsner from New York: ''Five per cent royalty. Will arrange extensions Washington Tuesday.'' Dougherty then went to Washington and with the assistance of Dennett, secured the extensions. On June 12, 1923, Dougherty wrote to Ochsner telling him an extension had been arranged good until December 31, 1923, and adding: ''confirming my telegram to you which I am sorry I delayed in sending: as per our understanding as my interest for services rendered etc. It will be five per cent royalty of all oil and gas produced''. By this letter and the prior telegram Dougherty voluntarily reduced his 10 per cent interest to 5 per cent.

It was about this time that Ochsner, Richard Young, and R. H. Arnold organized the Universal Oil Land Company, a Delaware corporation. The three men named became the company's first officers, and were its sole stockholders. The board of directors elected Young president and general manager with practically unlimited powers. This company's connection with this case will shortly appear.

While Ochsner was negotiating with the Coast Land Company, he wrote to Watson, who also had a permit on Kettleman Hills lands, subject to a Dougherty 10 per cent contract, to come to Los Angeles. Watson arrived in Los Angeles on May 25, 1923. Ochsner told him he had a deal pending, but did not or would not reveal the identity of the proposed assignee. He advised Watson that perhaps his permit could come into the deal. Watson and Ochsner discussed Dougherty's 10 per cent contract, and agreed that they should attempt to get Dougherty to reduce his claim to 1 per cent. Watson told Ochsner to go ahead and returned to his home in northern California. Ochsner's pending deal with the Coast Land Company called for a 7½ per cent reserved royalty on the ''discovery'' quarter, and a 2½ per cent reserved royalty on the remaining acreage. On May 30, 1923, Ochsner telegraphed to Watson informing him: ''Can place your Kettleman permit at five per cent royalty on discovery quarter section and two per cent remaining acreage. Strict

terms and protection. No reply from Dougherty but estimate one per cent straight on all from each of us as fair . . . "

Other events took place in May and June of 1923, which are important in connection with this transaction. Howard Payne, a close friend of Ochsner, and a business associate of Ochsner and Young in several deals in 1923, testified that he had several conferences with Ochsner and Young in May and June of 1923; that among other things, the three discussed the pending Coast Land Company deal; that when Ochsner told Payne that Dougherty's consent had not been secured, Payne told Ochsner that such consent should be obtained and that he, Payne, would like to buy Dougherty's interest; that on June 16, 1923, the witness interrogated Ochsner again as to what had been done concerning Dougherty; that Young stated that since Ochsner had not signed the Dougherty contract "Dougherty can not hold him (Ochsner) for anything". Payne then turned to Ochsner and expressed his surprise, informing Ochsner that Ochsner had told him he had signed the contract; that Ochsner replied that he had promised to do so but "I put it off, and put it off and never signed it"; that the witness advised Ochsner that in his opinion Dougherty had a valid claim, and that Ochsner should not proceed without Dougherty's consent. Later Payne talked with Young concerning Dougherty, and Payne stated that Ochsner was bound to get into trouble if he proceeded without first settling with Dougherty, to which Young replied, "If I was Doc (Ochsner) I would not give him (Dougherty) a damn thing. You cannot give title to real estate without a writing." At a later conference between these three men, on July 14, 1923, Ochsner told Payne the Coast Land Company deal was about to be signed, and when Payne asked him whether he had done anything about Dougherty, Ochsner replied: "No, to hell with Dougherty. He wants too much." The record shows that thereafter the attitude above disclosed was the one adopted by Ochsner and Young toward Dougherty.

On July 18, 1923, Ochsner entered into a written agreement with the Universal Oil Land Company to the effect that, if the Coast Land Company deal fell through, he would assign the permit to Universal, but if the deal was consummated, he would assign to Universal $6\frac{1}{2}$ per cent of the reserved

royalty on the discovery area and 2 per cent of the reserved royalty on the balance.

The Coast Land Company deal ripened into a signed contract under date of August 7, 1923, the actual assignment of the permit taking place on August 17, 1923. Under the terms of this agreement Ochsner agreed to transfer to the Coast Land Company "all of his right, title and interest" in and to the permit, subject to the approval of the Secretary of the Interior, which was later obtained, and the Coast Land Company in consideration therefor agreed to prospect for oil and gas on the property, to protect the permit, to start drilling a 5,000-foot well, and to put up a $20,000 cash bond as security for its performance. It further agreed to pay Ochsner "an overriding royalty of seven and one half (7½) per cent of all oil or gas produced and saved from that portion of the property hereinabove described and held as the 'discovery area' . . . an overriding royalty of two and one half (2½) per cent of all oil or gas produced and saved from the remainder of the land . . . " These percentages were to be based on gross production without deduction of the royalties payable to the United States Government. On the same day that he assigned the permit to Coast Land Company, August 17, 1923, Ochsner assigned 6½ per cent and 2 per cent of his reserved royalty to Universal pursuant to the agreement with that company of July 18, 1923. On October 8, 1923, the Coast Land Company assigned the Ochsner permit and contract to the General Petroleum Corporation. There is no evidence that either of these companies had any notice of Dougherty's claims until long after the dates of their respective assignments.

On the day after Ochsner assigned the permit to the Coast Land Company, that is on August 18, 1923, Dougherty met Young and Ochsner on a street in San Francisco. Dougherty had heard no more from Ochsner after the two telegrams of May 29th and June 6th above quoted. He asked Ochsner if he had disposed of the permit, and Ochsner told him that he had not—"that there was no deal on at that time" and that "he had not disposed of the permit". Ochsner also told Dougherty to meet him that afternoon at a designated time and place to talk the matter over. Dougherty kept the appointment but Ochsner did not. Dougherty did not discover the facts concerning the assignments until December of 1923.

Ochsner had retained 1 per cent and ½ per cent of the royalties in his name, apparently for the purpose of using them to negotiate a settlement with Dougherty. After several months had passed from the date of the Coast Land Company deal without Dougherty making a claim Ochsner determined to rid himself of even these royalties. In October of 1923 he and Young determined to transfer these royalties to Universal. Although this assignment took place in October, they dated back the assignment to August 20, 1923, and had the notary public date back her notarial record to that date.

In December of 1923, Dougherty on a visit to Washington, D. C., investigated the record of the permit and discovered the assignment to Coast Land Company and by it to the General Petroleum Corporation. Dougherty acted immediately to protect his rights. Under date of December 28, 1923, he wrote to the General Petroleum Corporation informing them he claimed an interest in the permit and asking for information. They replied informing Dougherty that Ochsner had reserved a royalty and that "the interest of no other person is indicated". On March 3, 1924, Dougherty notified both the Coast Land Company and the General Petroleum Corporation that he claimed a "five per cent royalty interest in any or all oil or gas produced" on lands covered by the permit. These notices were recorded in Kings County where the lands are located. Dougherty then retained an attorney, James Sweeney of San Francisco. Sweeney prepared a second notice notifying Coast Land Company and General Petroleum Corporation that Dougherty claimed a five per cent royalty interest in all oil or gas produced under the permit, and this document was recorded in Kings County in April of 1924. Another San Francisco attorney, John Percy, was associated with Sweeney by Dougherty to bring whatever action or actions were necessary to protect Dougherty's rights. Dougherty furnished his counsel with copies of his 10 per cent contract form and explained the facts to them. Sweeney prepared the original complaint, which was filed November 21, 1924. This complaint was signed by Sweeney, was unverified, and joined as defendants Ochsner, Coast Land Company, General Petroleum Corporation and Universal Oil Land Company. This original complaint was predicated on the theory that Ochsner and Dougherty were each entitled to one-half the proceeds from the royalties

reserved by Ochsner. Sweeney knew that the only contract ever presented to Ochsner was the 10 per cent contract, later reduced to 5 per cent, but because it was unsigned, and apparently because he did not believe that Dougherty had sufficient corroboration, he decided to file on the joint venture theory. In December of 1924 Sweeney filed an amended complaint signed by himself and unverified, for the purpose of joining the Marland Oil Company as defendant. In February of 1925, Dougherty's deposition was taken by defendants and at that time he testified as to his 10 per cent contract, and the contract form was introduced, together with the telegrams by which Dougherty's claim was reduced to 5 per cent. In 1925, a partial trial of the action was had before Judge Cabaniss, and Dougherty again testified as to his 10 per cent contract reduced to 5 per cent, and the supporting documents were introduced into evidence. Ochsner was present at this trial. Ochsner died in April of 1927, and thereafter Sweeney filed a supplemental and amended complaint joining the administratrix of Ochsner's estate as a defendant. In February of 1928 Sweeney prepared and Dougherty signed and verified a creditor's claim, which was filed in Ochsner's estate. This claim, as was the first amended and supplemental complaint, was predicated on Sweeney's theory of a joint venture.

In December of 1928, Young and Arnold, who with the Ochsner estate, held all the stock of the Universal Oil Land Company, met in New York, and organized under Delaware law the appellant corporation, the California Kettleman Oil Royalties, Inc. One of the purposes of organizing this corporation was to assign to it the royalties herein involved. Young became president and general manager of this new company. In January of 1929 Universal assigned the royalties to appellant. In February of 1929 Sweeney prepared and caused to be filed a second supplemental and amended complaint, verified by Dougherty, joining appellant as a party and alleging the assignment had been made to defraud Dougherty. This complaint was also predicated on the alleged fifty-fifty contract set forth in the original complaint. Appellant filed an answer verified by Young, and then filed several amendments thereto. In February, 1931, appellant filed a first amended and supplemental answer and cross-complaint. In March of 1931 Dougherty filed an answer to the cross-complaint, clearly alleging the existence of the 10 per cent

contract reduced to 5 per cent. On these pleadings the cause proceeded to trial before Judge Johnson in March of 1931, and again Dougherty testified at length as to his 10 per cent contract reduced later to 5 per cent. At this trial Dougherty, now represented by new counsel, sought leave to file a third amended and supplemental complaint to allege his 10 per cent contract, reduced to 5 per cent. The motion was denied, and Judge Johnson rendered judgment in favor of appellant. Thereafter, on motion duly made, Judge Johnson granted respondent's motion for a new trial. The present trial, a protracted one, was had before Judge Van Nostrand in 1933, and resulted in a judgment in accordance with the prayer of the complaint, declaring all of the royalties assigned to appellant to be held in trust for respondent. Many witnesses were produced on this trial who had not testified on the previous proceedings.

It should be here mentioned that Sweeney, prior to the trial held before Judge Johnson, had been replaced as counsel for Dougherty. Sweeney, it appears, had become counsel for others interested in the Ochsner estate whose interests were necessarily adverse to those of Dougherty. He was called as a witness on the present trial, and the privilege having been waived, testified at length concerning the filing of the various pleadings. Young, although he had been a witness for appellant in the Johnson trial, and although he had been president of appellant and of appellant's predecessor, was not called as a witness on the present trial. One of appellant's attorneys frankly admitted that he did not desire to put Young on the stand stating as his reason that "he wouldn't put a witness on the stand that he couldn't believe".

Prior to the present trial the action was dismissed as to all defendants except the California Kettleman Oil Royalties, Inc.

In his opening statement counsel for respondent fully discussed the state of the pleadings and informed the court that at the conclusion of the trial he was going to move to amend to conform to the proof to set up the 10 per cent contract reduced to 5 per cent. This motion was subsequently made and was granted, and a third amended and supplemental complaint was filed.

The trial court found the facts substantially as above set forth, and further found that appellant took the assignment

of the royalties *pendente lite* and with full knowledge of Dougherty's claims thereto. The court also found that oil was first produced in the Kettleman Hills in 1928; that a large sum of money has already accrued, and further sums will accrue in the hands of the General Petroleum Corporation. All of these findings are amply supported. The trial court adjudged that Dougherty was entitled to a 5 per cent overriding royalty on all oil or gas produced and saved from the lands covered by the Ochsner permit, that that percentage was more than $7\frac{1}{2}$ per cent on one quarter and $2\frac{1}{2}$ per cent on the balance, and decreed that appellant held all of these royalties in trust for the use and benefit of Dougherty.

At the threshold of our inquiry into the merits of this appeal we are met by appellant's contention that the Superior Court in and for the City and County of San Francisco had no jurisdiction to try this cause for the reasons that the royalty interest involved is real property or real estate, and the action is one to recover possession or quiet title to such real estate, and that such action, under the provisions of article VI, section 5, of the state Constitution, could only have been commenced in Kings County where it is admitted the lands subject to the royalty are situate.

The pertinent provisions of article VI, section 5, are as follows: "The process of superior courts shall extend to all parts of the state; provided that all actions for the recovery of the possession of, quieting the title to, or for the enforcement of liens upon real estate, shall be commenced in the county in which the real estate, or any part thereof, affected by such action or actions, is situated."

Preliminarily it should be stated that this contention was at no time advanced in the trial court either on the present trial or on the two previous trials, nor is it mentioned in the appellant's opening brief filed in this court. The contention first appears in appellant's reply brief. Since the point was first raised, numerous briefs have been filed by both parties to this appeal devoted entirely to a discussion of this question. While it is true that the point here raised is jurisdictional, and cannot be waived (*Fritts* v. *Camp,* 94 Cal. 393 [29 Pac. 867]), it is quite strange that counsel of the ability of those representing appellant did not see fit to raise the point until this late date. That is some evidence that the point is

not quite as clear or obvious as counsel would have it now appear.

Appellant makes some effort to show that the point was presented to the trial court by quoting from a demurrer filed by it to the third amended and supplemental complaint. In that demurrer one of the grounds urged was that the trial court had no jurisdiction of the subject matter of the action, but respondent contends, and his contention is supported by the wording of the demurrer, that the ground then being urged had reference to the claim that the cause had been transferred to the federal court.

■ It is well settled that the constitutional provision above quoted, being a limitation on the general jurisdiction of the superior courts, must be strictly construed. (*Miller & Lux* v. *Kern County Land Co.,* 140 Cal. 132 [73 Pac. 836] ; *Fitzpatrick* v. *Sonoma County,* 97 Cal. App. 588 [276 Pac. 113] ; *Cohen* v. *Hellman Commercial etc. Bank,* 133 Cal. App. 758 [24 Pac. (2d) 960].) Keeping this rule of construction in mind, we have no hesitancy in holding that the constitutional provision in question has no application to the case at bar.

■ In the first place the royalty involved is not "real estate" within the meaning of article VI, section 5. The subject-matter of this action consists of a royalty interest under oil and gas leases issued on public lands situated in Kings County under authority of the act of Congress of February 25, 1920, above referred to. That statute, as will later appear, as originally enacted and as it read in 1924 when this action was commenced, provided for leases for a period of twenty years. The present action involves the right to accumulated royalties already produced, and royalties hereafter to accrue.

■ It is perfectly clear that the term "real estate" as used in the constitutional provision only applies to freehold interests. It does not apply to interest less than a freehold, such as an interest for a term of years. It has quite recently been held by this court that an oil and gas lease for a term of years is not real estate; that although such a lease creates an interest in real property, or in real estate, being less than a freehold it is a chattel real which is personal property (*Callahan* v. *Martin,* 3 Cal. (2d) 110 [43 Pac. (2d) 788, 101 A. L. R. 871] ; *Dabney-Johnston Oil Corp.* v. *Walden,* 4 Cal. (2d) 637 [52 Pac. (2d) 237] ; *Schiffman* v. *Richfield Oil Co.,* 8 Cal. (2d) 211 [64 Pac. (2d) 1081]). Obviously a royalty

interest, such as is here involved, cannot rise to a greater dignity than the lease upon which it is predicated.

◼ Appellant, while recognizing the force of the above argument, contends that it is not applicable here for two reasons: First, that under the federal act of 1920, the lease issued to appellant was not for a limited term of years, but was for an indeterminate period; and secondly, that whatever doubt may have existed on this point was set at rest by an amendment to the leasing act adopted July 3, 1930 (30 U. S. C. A., sec. 226) expressly providing that under some circumstances such leases shall continue for an indefinite period. Based on the premise that under these provisions the lease is for an indeterminate period, appellant earnestly urges that the royalty interest here involved must be determined to be real property or real estate. The courts have been frequently called upon to determine the nature of oil and gas interests (*Callahan* v. *Martin, supra; Dabney-Johnston Oil Corp.* v. *Walden, supra; Schiffman* v. *Richfield Oil Co., supra; Western Oil etc. Co.* v. *Venago Oil Corp.*, 218 Cal. 733 [24 Pac. (2d) 971, 88 A. L. R. 1271]; *Standard Oil Co.* v. *John P. Mills Organization*, 3 Cal. (2d) 128 [43 Pac. (2d) 797]). The problems presented in this field have not as yet been entirely settled. Such problems should be left for decision to cases wherein they are directly presented. In the present case, even if we assume (without deciding) that if the leases held by appellant were for an indeterminate period, the royalty interest here involved would be real estate, such assumption would in no way assist appellant for the reason that we are of the view that under the act of 1920 the lease granted to appellant was for a definite and limited term of years, and further, that the 1930 amendment has no application to the case at bar.

◼ The federal oil land leasing act, as originally passed in 1920, provided that after the permittee had established to the satisfaction of the Secretary of the Interior that oil or gas had been discovered on the lands covered by a permit, the permittee, under certain conditions, should be entitled to a lease. Section 223 provided that "such leases shall be for a term of twenty years . . . with the right of renewal as prescribed in section 226 of this title . . . " Section 226, as it read in 1920, provided: "Leases shall be for a period of twenty years, with the preferential right in the lessee to

renew the same for successive periods of ten years upon such reasonable terms and conditions as may be prescribed by the Secretary of the Interior, unless otherwise provided by law at the time of the expiration of such periods . . . ''

It is appellant's position that the above quoted provision dealing with renewals makes the lease for an indeterminate period, and therefore real estate. We do not agree with this contention. The statute designates the lease as one for twenty years. The right of renewal conferred by the statute is merely an option for renewal, and the exercise of the option entails the making of a new lease which creates a new estate. Moreover, in this case, the lessor, the United States Government, has retained the right to dictate the terms of the renewal lease.

There are many cases holding that an option to purchase land, or to renew a lease, does not transfer any interest in the land. (*Ware* v. *Quigley,* 176 Cal. 694 [169 Pac. 377]; *Howard* v. *D. W. Hobson Co.,* 38 Cal. App. 445 [176 Pac. 715]; *Los Angeles Flood Control Dist.* v. *Andrews,* 52 Cal. App. 788 [205 Pac. 1085]; *Richanbach* v. *Ruby,* 127 Or. 612 [271 Pac. 600, 61 A. L. R. 1441].) As was said in *Estate of Fellows,* 106 Cal. App. 681, 684 [289 Pac. 887]: ''The renewal of the lease is the creation of a new estate and not a mere perpetuation of an old one.'' See, also, *Robertson* v. *Drew,* 34 Cal. App. 143 [166 Pac. 838]; *Braun* v. *Leo G. MacLaughlin Co.,* 93 Cal. App. 116 [269 Pac. 191]; *Howell* v. *City of Hamburg Co.,* 165 Cal. 172 [131 Pac. 130]. It should also be mentioned that apparently the government did not believe that the act as above quoted was equivalent to the granting of a lease for the indeterminate period of so long as oil or gas may be produced, for the reason that when the government determined to make the leases for an indeterminate period in 1930 it found it necessary to amend section 226 to so provide. For the foregoing reasons we are of the opinion that the act as it read in 1920 and until amended in 1930, provided for a lease for a limited number of years, and that such a lease was a chattel real—personal property.

Appellant further contends (and this contention was made in one of its last briefs) that the act was amended in 1930 to expressly provide that under some circumstances such leases should be for an indeterminate period, thus making them ''real estate''. It is true that on July 3, 1930, and again

in 1931, and again in 1935, section 226 was amended so as to now provide that as to leases already issued under the act as originally passed, such leases should be under some circumstances for an indeterminate period. After providing that the amendment shall apply to all leases issued prior to August 21, 1935, the act now provides: ''Provided, That any such lease that has become the subject of a cooperative or unit plan of development or operation, or other plan for the conservation of the oil and gas of a single area, field, or pool, which plan has the approval of the Secretary of the Department or Departments having jurisdiction over the Government lands included in said plan as necessary or convenient in the public interest, shall continue in force beyond said period of twenty years until the termination of such plan . . . '' It was stipulated during the present trial that the leases here involved have become ''the subject of a cooperative or unit plan of development or operation'', that is, that the leases here involved have become subject to an agreement with the Kettleman North Dome Association. It further appears from facts of which we have judicial notice (Code Civ. Proc., sec. 1875, subd. 3; *Parker* v. *James Granger, Inc.*, 4 Cal. (2d) 677, 688 [52 Pac. (2d) 226]) that in 1931 the Secretary of the Interior approved the formation of the Kettleman North Dome Association and so reported to Congress. The agreement provides no period for the termination of the plan. It therefore follows that under section 226 as amended in 1930 the leases here involved have been, since that date, for an indeterminate period of time. However, if it be assumed that the leases here involved are now real estate, by virtue of the 1930 amendments, such concession in no way assists appellant. Article VI, section 5, above quoted, only applies to the commencement of the action. It provides that the designated types of action ''shall be commenced in the county in which the real estate . . . is situated''. The present action was ''commenced'' in 1924, when the complaint was filed. At the time of the commencement of the action, the only lease permitted by federal law was a lease for a limited number of years, and was, therefore, for reasons already stated, personal property. The constitutional provision is only concerned with the status of the case at its commencement. As was said in *Miller & Lux* v. *Kern County Land Co.*, 140 Cal. 132, 134 [73 Pac. 836], in holding that events occurring subsequent to

the filing of the complaint did not bring the action within the constitutional clause above quoted: ''The provision of the constitution above cited is a limitation on the general jurisdiction of the superior court, and is to be strictly construed. It goes no further than to prohibit the *commencement* of certain enumerated actions affecting real property in counties other than those in which the realty is situated. . . . The action having been properly commenced, so far as the constitutional provision is concerned, and jurisdiction having once attached, we cannot construe that provision as operating to divest jurisdiction merely because the answer contains allegations that make it apparent that the determination of the action will necessarily involve the question of title to or possession of real property. . . . The law should be such as to inform a plaintiff with certainty as to the place where he may bring his action. But the provision in question affords little room for construction. It refers solely to the time of the commencement of the action, and makes the question of jurisdiction depend upon the condition of the record at that time.'' That reasoning is clearly applicable to the instant case. The changing of the law in 1930 did not affect the jurisdiction of the Superior Court of the City and County of San Francisco, which had attached in 1924.

Appellant urges, however, that the complaint as filed in 1924 did not disclose that the action came within the purview of article VI, section 5, and that that fact did not appear until the filing on May 3, 1935, of the plaintiff's third amended and supplemental complaint. This is but another way of stating appellant's contention that the last named complaint states a cause of action different from that contained in the original complaint, and in the intervening complaints. As will later appear that contention is without merit.

A second and complete answer to appellant's contention that article VI, section 5, is applicable to this cause, is that the present action is not one ''for the recovery of the possession of, quieting the title to, or for the enforcement of liens upon real estate'' within the meaning of that provision. As already stated the present action is for royalties already accumulated, and to be hereafter accumulated. It is an equitable action to enforce a trust. Even if the subject of the trust were real estate (which as we have seen it is not), such an action does not come within the purview of the constitutional provi-

sion (*Le Breton* v. *Superior Court,* 66 Cal. 27 [4 Pac. 777], quoting from and relying upon the leading case of *Massie* v. *Watt,* 6 Cranch (U. S.), 148, 160; see, also, *Cohen* v. *Hellman Commercial T. & S. Bank, supra*).

 On the merits of this appeal appellant urges numerous points, most of which are highly technical and all of which are without merit. Its first major contention, although rather ambiguously stated, seems to be that, admitting the existence of the 10 per cent contract between Ochsner and Dougherty, the provision for payment by Ochsner to Dougherty was a mere personal covenant not binding on the assignees of Ochsner. For this reason it is urged that the third amended and supplemental complaint does not state a cause of action against California Kettleman Oil Royalties, Inc. The point is clearly without merit, as is the related point that the contract is unenforceable because within the statute of frauds. This is an action to enforce a trust as to oil royalties. Such an action is clearly enforceable against an assignee who takes with notice of the outstanding royalty (*Western Oil etc. Co.* v. *Venago Oil Corp., supra*). Even if the covenant on the part of Ochsner were a mere personal covenant it would be enforceable in equity against those who took with notice (*Hunt* v. *Jones,* 149 Cal. 297 [86 Pac. 686]; *Bryan* v. *Grosse,* 155 Cal. 132 [99 Pac. 499]; *Martin* v. *Holm,* 197 Cal. 733 [242 Pac. 718]). In the present case the trial court found that both Universal and appellant took their respective assignments with full knowledge of Dougherty's outstanding claim. The facts already recounted thoroughly establish that there is no conflict on that point. The fact that the agreement between Dougherty and Ochsner rested in parol is of no legal significance in this case. This agreement was fully ' executed by Dougherty. Assuming the contract could not be performed within a year and therefore fell within the statute of frauds, the circumstances of this case, showing as they do complete performance by Dougherty, clearly create an estoppel to plead the statute. Dougherty's performance was clearly induced by Ochsner's representations that he would sign the contract. This creates an estoppel (*Seymour* v. *Oelrichs,* 156 Cal. 782 [106 Pac. 88, 134 Am. St. Rep. 154]). Another complete answer to this point is that under the facts of this case the moment the permit was issued a trust resulted in favor of Dougherty. As to that trust neither Ochsner nor

his assignees with notice may successfully plead the statute. (*Byers* v. *Doheny*, 105 Cal. App. 484 [287 Pac. 988] ; *Hidden* v. *Jordan*, 21 Cal. 92, 93.)

Appellant also urges that under the various right, title, and interest assignments here made, Dougherty's action, if any, lies against the ultimate assignee of the lease—the General Petroleum Corporation. This contention is predicated on the recent decision of this court in *Schiffman* v. *Richfield Oil Co.*, *supra*, and the cases cited therein. The rule of that case is not here applicable. In that case this court did hold that the Richfield Oil Company, as final assignee of the sub-lessee of an oil and gas lease was obligated to pay the royalties which its assignor had assigned prior to the transfer of the lease to Richfield. In that case Richfield took its assignment of the sub-lease with full knowledge of the prior royalty assignments by its assignor. In the present case the General Petroleum Corporation is not now a party, and there is no finding as to its knowledge of Dougherty's claim. This action is over the ownership of the royalty reserved by Ochsner in his assignment to the Coast Land Company. As to that royalty it is not disputed by the two parties hereto, nor apparently by the General Petroleum Corporation, that the last named company should pay—the question is as to who should receive it.

Under Dougherty's contract with Ochsner, the latter had the right to assign the permit except that he was bound to reserve and protect the percentage already assigned to Dougherty. The court has found, and such finding is supported by the record, as well as by reason and the law, that when Ochsner assigned the permit to the Coast Land Company reserving a percentage that is mathematically less than the percentage he had already assigned to Dougherty, the percentage reserved was the property of Dougherty. This is the clear holding in *Merritt Oil Corp.* v. *Young*, 43 Fed. (2d) 27.

The next three contentions of appellant are somewhat related, and all deal with the statute of limitations. It is first contended that the contract was oral and was repudiated by Ochsner on April 16, 1921, when the permit was issued and Ochsner did not then sign the contract. According to appellant's contention the contract was that Ochsner would sign when the permit was issued, and the complaint not having been filed until November, 1924, it was barred by the two-year

provision of section 339 of the Code of Civil Procedure. The contention is not in accordance with the facts. The contract was that Ochsner should hold the title to the permit, deal with it, and should pay Dougherty his agreed share. Dougherty had no cause of action until Ochsner repudiated this agreement. From the date of the issuance of the permit in April 1921, in fact from November, 1920, until the Coast Land Company deal was consummated in August of 1923, Ochsner clearly gave every indication that he intended to live up to his obligations toward Dougherty—in fact, until that date, he frequently told Dougherty that he was going to live up to his bargain. As the facts already recounted indicate, as late as June of 1923, Ochsner recognized the existence and validity of Dougherty's claim. It was not until Young, appellant's former president and general manager, had raised the question of the statute of frauds, that Ochsner, so far as his actions indicate, determined to repudiate his agreement with Dougherty. He then took steps to conceal, and did conceal, the fact of his assignments from Dougherty. He attempted to conceal the amount of the royalty reserved by him in his contract with the Coast Land Company by the first assignment to Universal, retaining a mere 1 per cent on the discovery area and ½ per cent on the balance of the area in his own name. On August 18, 1923, Ochsner positively informed Dougherty in Young's presence, that no deal was pending or had been consummated, when in fact, he had assigned his permit to Coast Land Company on August 17th. In October of 1923, Ochsner, with Young's assistance, assigned the balance of the royalty remaining in his name to Universal, and dated back the assignment to August. It was not until December of 1923 that Dougherty, upon investigation of the records of the land office in Washington, D. C., discovered the transfer. This action was commenced in November of 1924. Under this state of facts, even though the two-year provision found in section 339 of the Code of Civil Procedure is applicable (although the true limitation in actions predicated on trusts is probably four years) (*Hannah* v. *Canty*, 175 Cal. 763 [167 Pac. 373] ; *Cortelyou* v. *Imperial Land Co.*, 166 Cal. 14 [134 Pac. 981]), the action was commenced well within two years from the date of repudiation. The mere failure on Ochsner's part to sign the contract when the permit was issued certainly did not constitute a repudiation in view of his

repeated promises to sign and in view of his repeated acknowledgments of the existence and validity of the contract.

The second contention of the appellant based on the statute of limitations is predicated on the rather confused state of the pleadings. The exact nature of appellant's highly technical contention is rather difficult to ascertain. The appellant—California Kettleman Oil Royalties, Inc.—became a party to this action in February of 1929. It was stipulated that the second amended and supplemental complaint was filed for the purpose of bringing in appellant as a party. Thereafter the action was dismissed as to all other defendants including the Universal, assignor of appellant. It seems to be appellant's theory that since no order substituting appellant for Universal was made, and since appellant became a party by amendment of the pleadings while Universal was still a party, as to it the statute of limitations had long since barred the action. Appellant admits that under the provisions of section 1908 of the Code of Civil Procedure an assignee who takes with notice *pendente lite* is bound by any judgment against its assignor rendered in the pending action, and that this is so even though the assignee is not made a formal party. Appellant admits that under this section it would have been bound by any judgment rendered against Universal, its assignor, but points out that the only judgment so rendered is a judgment of dismissal, to the benefits of which appellant is entitled. It is further contended that appellant was at no time substituted in the place and stead of Universal, but became a new party by amendment. Appellant relies on the general language appearing in many cases that where a defendant is dismissed from an action before judgment "the effect of the dismissal is the same as if he had never been made a party" (*Holt Mfg. Co.* v. *Collins,* 154 Cal. 265 [97 Pac. 516] ; see, also, *Page* v. *W. W. Chase Co.,* 145 Cal. 578 [79 Pac. 278] ; *Union Tank etc. Co.* v. *Mammoth Oil Co.,* 134 Cal. App. 229 [25 Pac. (2d) 262]). It is therefore contended that since before judgment the action was dismissed as to all other defendants, who must be treated as if they never had been made parties, the action was "commenced" as to appellant in February, 1929, the dismissals removing appellant from the status of an assignee *pendente lite.*

The argument, although ingenious, is obviously unsound. In the event of the transfer of an interest *pendente lite,* section 385 of the Code of Civil Procedure provides that the action "may be continued in the name of the original party, or the court may allow the person to whom the transfer is made to be substituted in the action". As already pointed out appellant was organized in December, 1928, for the very purpose of taking the assignment from Universal of the very royalties here involved. This assignment was made in January, 1929, and within less than one month thereafter, and within two months from the date appellant was organized, Dougherty, after first securing leave of court, filed his second amended and supplemental complaint joining appellant as a party. In this complaint the fact of the assignment was alleged, and it was further alleged that the assignment had been made for the purpose of hindering, delaying and defrauding the plaintiff. Under section 1908 of the Code of Civil Procedure the assignee steps into the shoes of its assignor. It is probably true that in such a case the more orderly method of procedure is to move for a substitution. However, appellant made no objection—in fact, appellant answered, amended twice by leave of court, and invoked the trial court's jurisdiction by filing a cross-complaint. Under the authority of *Ford* v. *Bushard,* 116 Cal. 273 [48 Pac. 119], and *City of Santa Barbara* v. *Eldred,* 95 Cal. 378 [30 Pac. 562], appellant waived its right to object. The cases cited by appellant are not in point.

The third contention of appellant based on the statute of limitations is that the last complaint filed by respondent in 1935 to conform to the proof, states a totally different cause of action than does the prior complaints, and that as to this last cause of action the statute had long since run. This contention is predicated on the fact that the first complaint, and all the later complaints, with the exception of the one filed in 1935, alleged a fifty-fifty interest of Dougherty with Ochsner in the proceeds of the permit, while the 1935 complaint alleged, and the trial court found, that the contract was that in consideration of services rendered Dougherty was to receive 10 per cent (later reduced to 5 per cent) of all oil or gas produced under the permit. The appellant strenuously urges that the two pleaded contracts are entirely different—one that Dougherty was to get half the profits realized by

Ochsner, the other that he was to receive 10 per cent of production (later reduced to 5 per cent).

It is elementary that a complaint may not be amended to set up an entirely different cause of action from the cause of action originally pleaded, at least where the statute of limitations has run (*Merchants Nat. Bank* v. *Bentel,* 166 Cal. 473 [137 Pac. 25] ; *Bowman* v. *Wohlke,* 166 Cal. 121 [135 Pac. 37, Ann. Cas. 1915B, 1011] ). However, a reading of all of the complaints here involved indicates that all of them, including the last one, are directed at the same transaction. All of the pleadings allege an oral agreement the consideration for which was certain services rendered by Dougherty. The services are alleged in detail in all complaints in substantially the same language. The only major difference between the early complaints and the last one is to be found in the allegations describing the consideration that was to move from Ochsner to Dougherty.

If no third amended and supplemental complaint had been filed, under sections 469 and 470 of the Code of Civil Procedure, the variance here charged would have been immaterial, for the reason that it is well settled that a mere difference in quantity of consideration between the pleading and proof is not a material variance (*Gibson* v. *McReynolds,* 175 Cal. 263 [165 Pac. 921] ; *Peasley* v. *Hart,* 65 Cal. 522 [4 Pac. 537] ; *Howard* v. *D. W. Hobson Co.,* 38 Cal. App. 445 [176 Pac. 715] ). It has likewise been held, and for exactly the same reasons, that a mere change in the *quantum* of consideration to be paid under a contract, does not constitute a change in the cause of action (*Ford* v. *Ford,* 44 Cal. App. 415 [186 Pac. 164] ; *Sieck* v. *Hall,* 139 Cal. App. 279 [34 Pac. (2d) 844] ). These cases, and many others that could be cited, clearly establish that under the circumstances here pertaining the granting of leave to amend rested in the sound discretion of the trial court, and that the amended complaint did not state a cause of action different from that contained in the earlier complaints. None of the numerous cases cited by appellant is in point. They all relate to situations where the amended pleading related to a contract made at a time different from that alleged in the original complaint, or between different parties. None of them relates to different statements of the same contract. As already stated, all of the com-

plaints filed in the present action clearly and obviously refer to the same contract.

Appellant is clearly in no position to urge that there was an abuse of discretion in granting leave to amend to conform to the proof, for it was at no time under any misapprehensions as to the nature and extent of Dougherty's claim. In February of 1925 Dougherty's deposition was taken by the then defendants, one of whom was Universal, appellant's predecessor in interest, and at that time Dougherty testified fully and completely that his claim was predicated on the 10 per cent contract, reduced to 5 per cent. In October of 1925 a partial trial was had before Judge Cabaniss, and Dougherty again testified as to his 10 per cent contract, reduced to 5 per cent, and the form contract was introduced into evidence. In March of 1931, Dougherty answered the cross-complaint of this appellant, and alleged his 10 per cent contract reduced to 5 per cent, and attached a copy thereof to his answer to the cross-complaint. In the same month the cause proceeded to trial before Judge Johnson, and the only contract testified to was the 10 per cent contract reduced to 5 per cent. Moreover, Young was president and general manager of Universal and as such, participated in all these prior proceedings. In 1929 he became president of appellant. Young knew the exact nature of Dougherty's claim; it was in fact upon his advice that Ochsner decided to repudiate. Obviously appellant was in no way misled by the allegations appearing in the earlier pleadings.

The last major contention of appellant is that the contract found by the trial court to have been entered into in November, 1920, is void and illegal, and conveyed no interest of any kind to Dougherty, by reason of one of the regulations of the federal land office, and by reason of the provisions of section 1045 of the Civil Code.

The regulation relied on is section 12½ of the oil and gas regulations of the General Land Office of the Department of the Interior, promulgated in March, 1920, under the oil leasing act here involved. It reads as follows: "Permits after being awarded may be assigned to qualified persons and corporations upon first obtaining the consent of the Secretary of the Interior. Mere rights to receive a permit are not assignable".

Appellant admits that under this regulation no individual may raise the defense of the lack of consent on the part of the Secretary of the Interior, that being a point that can only be raised by the sovereign. That is undoubtedly the law (*Isaacs* v. *De Hon,* 11 Fed. (2d) 943, and cases cited). However, it is contended that under the last sentence of the above quoted regulation any purported assignment prior to the issuance of the permit is expressly prohibited, and any such assignment is void and illegal. It is to be noted that Ochsner's contract called for the payment of 10 per cent of the oil or gas produced to Dougherty and was not an assignment of the right to receive a permit.

Great reliance is placed by appellant on the case of *Alford* v. *Hesse,* 100 Cal. App. 66 [279 Pac. 831]. There can be no doubt that that case supports appellant's contentions. There the plaintiffs, the makers of certain promissory notes, brought an action to cancel the same. The notes had been given to the payee for the privilege of exploring certain lands for oil on which the defendant had a permit. The alleged ground of cancellation was that defendant had represented that he had an unencumbered title to the permit when in fact prior to the issuance of the permit the prospective permittee had assigned certain royalty interests to others. The appellate court held (no hearing was asked for in this court) that under the above quoted regulation the alleged transfers having taken place before a permit was issued, were ''of no validity''. No authority is cited to support this conclusion. We do not believe this construction of the legal effect of the regulation should be or can be followed by this court.

In the first place, in determining the interpretation and effect of federal statutes or regulations, this court is bound by the interpretation placed upon them by the federal courts (*Mackenzie* v. *Hare,* 165 Cal. 776 [134 Pac. 713, Ann. Cas. 1915B, 261, L. R. A. 1916D, 127]). The federal courts have interpreted the very regulation here relied upon as available only to the government—or stated negatively, a violation of it is not available to an individual. In *Isaacs* v. *De Hon, supra,* the action was to have defendants declared trustees for plaintiffs as to specified fractional interests in an oil and gas prospecting permit issued in the name of one of the defendants. This permit had been issued under the same act of February 25, 1920, as the permit here involved. The evidence showed that prior to the issuance of the permit, in fact

on February 14, 1920, before the act under which the permit was later issued had been passed, plaintiffs entered into a grubstake agreement with defendants (husband and wife) under which plaintiffs were to be entitled to certain specified interests in any oil or gas claims located by defendants. Defendants subsequently located an oil claim and secured a permit in one of their names. One of the defendants' defenses was predicated on both sentences of section 12½ of the regulations above quoted. The court, ninth circuit, after quoting the regulation, stated: ''Appellant is in no position to take advantage of this regulation. . . . But appellant is nevertheless held in a court of equity to the obligations he assumed in his grubstake contract. . . . But the courts do have power to enforce contracts with reference to lands while title thereto is held by the government.'' The same general doctrine was enunciated in *Alaska Consol. Oil Fields* v. *Rains,* 54 Fed. (2d) 868, and in *Merritt Oil Corp.* v. *Young, supra.* These cases are all predicated on the general rule that regulations such as the one here involved are designed to protect the government and cannot be taken advantage of by anyone other than the government (*Shea* v. *Nilima,* 133 Fed. 209; *Blochman Com. etc. Bank* v. *F. G. Investment Co.,* 177 Cal. 762 [171 Pac. 943]).

Appellant's somewhat similar contention based on section 1045 of the Civil Code is equally without merit. That section provides that ''A mere possibility not coupled with an interest, cannot be transferred''. The legal principle thus codified is not peculiar to California, but is generally recognized. However, it is well settled in this state, and elsewhere, that the restraint thus provided is applicable only to legal rights and does not apply in a case where the principles of equity are properly invoked. Equity, before and after the adoption of the codes, has always recognized assignments of contingent interests and expectations. (See 3 Cal. Jur., p. 247 et seq., and cases cited.) None of the cases cited by appellant is in point.

There are other contentions made by appellant. We have considered all of them and they are without merit.

The judgment appealed from is affirmed.

Thompson, J., deeming himself disqualified, did not participate herein.

Rehearing denied.